736 A.2d 1185

Susan M. Miller HAIGLEY

v.

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**

No. 1832, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 9, 1999.

Maureen E. Murphy (Murphy & Murphy, L.L.C., on the brief), Cantonsville, for appellant.

Helen E. Bowlus, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before HARRELL, HOLLANDER and ADKINS, JJ.

HOLLANDER, Judge.

This appeal concerns the scope of the Maryland Public Information Act ("PIA"), Maryland Code (1984, 1995 Repl. Vol., 1998 Cum.Supp.), §§ 10–611 through 10–628 of the State Government Article ("S.G."). We must determine whether the PIA requires the Department of Health and Mental Hygiene ("DHMH" or "the Department"), appellee, to release information to Susan Miller Haigley ("Ms.Miller"),[1] appellant, identifying the Baltimore County eating establishment from which appellant may have contracted hepatitis. The Department refused to disclose the requested information, asserting that the information was "confidential" under Md.Code (1982, 1994 Repl.Vol.), §§ 4–101 and 4–102 of the Health–General Article ("H.G."), and therefore not available pursuant to S.G. § 10–615.

After the Circuit Court for Baltimore County affirmed the Department's decision, appellant noted her appeal. She presents a single issue for our review, which we have rephrased slightly:

> Pursuant to the Maryland Public Information Act, is appellant, who contracted hepatitis from an unknown establishment in Baltimore County, entitled to information regarding the results of the investigation conducted by the Department of Health and Mental Hygiene?

For the reasons that follow, we shall neither affirm nor reverse, but shall remand to the circuit court for further proceedings. See Md. Rule 8–604(d).

## Factual Background[2]

Appellant was diagnosed on January 28, 1998, with hepatitis

---

1. We use "Ms. Miller", rather than "Ms. Haigley," because that is the name that appellant has used in her brief.

2. The underlying facts are gleaned primarily from the parties' averments before the trial court and from their appellate briefs. Most, but not all, of the relevant facts are undisputed. Because the case proceeded to the circuit court without an administrative hearing, the record is

A, which she contracted in December 1997 or January 1998.[3] She was treated by physicians at the Johns Hopkins Hospital. During the course of her illness, appellant was admitted to the hospital on four occasions. She suffered the symptoms of the disease for ten weeks and, according to appellant, "became critical and . . . almost died."

Upon identifying appellant's illness, personnel at Johns Hopkins Hospital notified DHMH and the Baltimore County Department of Health and Mental Hygiene, as required by H.G. § 18–201.[4] After DHMH was notified, appellant contends that the Department conducted a "case investigation" to determine the identity of the establishment; the Department avers that it undertook a "study" to discover the reason for an increase in hepatitis A in Baltimore County.[5] As part of its inquiry, the Department interviewed appellant while she was in the hospital, and collected from her a list of eating establishments that she patronized during the time she may have contracted the disease. Based on information the Department collected from appellant and other hepatitis patients, the Department visited a number of Baltimore County eateries in order to test their food and identify the potential source of appellant's illness. Neither party has furnished the court with details as to how many establishments were investigated, nor what the investigations entailed. According to appellant's brief, a Department investigator informed her in the "Spring

---

not altogether helpful in resolving discrepancies in the parties' competing factual assertions.

**3.** Appellant informs us in her reply brief that hepatitis "does not manifest itself until at least 4 weeks after incubation."

**4.** Health–General § 18–201(a) provides:

A physician with reason to suspect that a patient under the physician's care has an infectious disease that endangers public health shall submit immediately a report to the health officer for the county where the physician cares for that patient.

**5.** As we shall discuss, *infra,* whether the DHMH's endeavor was a "study" or a "case investigation" is a central issue in the appeal.

of 1998" that the Department had "discovered the identity of the Establishment."

Appellant asserts that she cooperated with the Department in part because the Department told her that it would reveal the identity of the offending restaurant to her; the Department denies that it made any such assurance. Appellant also asserts, and the Department denies, that DHMH investigators took "stool, blood and other samples" from her.[6]

On April 14, 1998, Ms. Miller wrote a letter to Carmela Groves, Chief of the DHMH's Division of Outbreak Investigation, requesting information related to her case. Appellant wrote, in pertinent part:

Dear Ms. Groves:

I am writing to request records pertaining to the recent increase in Hepatitis A in Baltimore County. I believe I was one of the cases involved in this increase since I was diagnosed with Hepatits A on January 25, 1998 and I live in northern Baltimore County in Timonium and ate at several of the establishments that were in question during the time it was believed that the cases were infected.

I have been speaking with Dave Portesi and he is aware of the severity of my case. I was ill from Hepatitis A for over 10 weeks and am still under the care of a specialist at Johns Hopkins for the illness. I was hospitalized 4 times during the course of my illness. Because of this, I was unable to work and have incurred high medical expenses. I would like the opportunity to recoup these costs through legal action. Please provide me with this information at your earliest convenience.

On May 15, 1998, Ms. Groves informed appellant that although some records regarding the investigation would be available to her for a fee, the Department would not identify the establishment from which she contracted the disease.

---

**6.** We note that even if the Department did not take samples from appellant, it may have had access to the results of tests performed while appellant was in the hospital.

Appellant declined to receive the redacted records, and asked Ms. Groves how she could appeal the Department's decision. On May 21, 1998, Ms. Groves wrote appellant a letter explaining the reasons for DHMH's decision. Ms. Groves responded, in pertinent part:

I am unable to comply with your request for records, as Maryland's Public Information Act, State Gov't § 10–615 requires that a custodian of a public record that is confidential by law deny inspection of that record. Pursuant to Md.Code Ann., Health–General (Health–General) §§ 4–101 and 4–102, any records, reports, or other information assembled for research or study by the Secretary of Health and Mental Hygiene that names or otherwise identifies any person, is confidential and may not be disclosed to anyone not engaged in the research or study.

* * *

In regard to the recent increase in hepatitis A in Baltimore County, the Maryland Department of Health and Mental Hygiene, Division of Outbreak Investigation conducted research or study under Health–General 4–101 and 4–102. The documents generated or received by the Division of Outbreak Investigation in conducting this research or study identify various persons. Under Health–General §§ 4–101 and 4–102, the Division is unable to release to you the identity of those persons. In addition, the files also contain medical information identified to an individual. Furthermore, I am denying you reports pursuant to Health–General §§ 18–201, 18–202, or 18–205. Pursuant to these statutes, the records are confidential, not open to public inspection, and subject to subpoena or discovery in any criminal or civil proceeding only pursuant to a court order sealing the court record.

Ms. Groves's letter was consistent with a policy the Department had established beginning in 1991 regarding the release of what it considered as confidential information. On March 27, 1991, Diane M. Dwyer, M.D., Chief of the DHMH's Center for Clinical Epidemiology, asked the Office of the Attorney

General for "an official opinion ... concerning the issue of confidentiality." Doctor Dwyer's letter asserted that the Department was "receiving requests for release of information that ask for the 'entire file' rather than simply [the Department's] 'final report.' " The Department's questions included the following:

> 1. Are investigations of communicable disease outbreaks (e.g. influenza, *Salmonella* food poisoning, etc.) considered "research or study" and therefore covered under Health–General Article, Sections 4–101 and 4–102, Annotated Code of Maryland as a "confidential record"?
>
> \* \* \*
>
> 2. If investigations of communicable disease outbreaks are covered under Health–General Article, Sections 4–101 and 4–102, Annotated Code of Maryland, then are the final reports summarizing the investigation and results subject to public inspection?
>
> \* \* \*
>
> 6. Are the names of businesses and institutions such as hospitals, restaurants, food distributors, farms, and other establishments protected from public inspection under Health–General Article, Section 1–101, 4–101 and 4–102, Annotated Code of Maryland?

The Office of the Attorney General responded to the Department's inquiry in a letter dated April 30, 1991, co-authored by Jack Schwartz, Chief Counsel for Opinions and Advice, and Helen E. Bowlus, Staff Attorney and counsel for the Department in the case *sub judice*. They answered the questions set forth above in the following way:

> 1. Information developed as part of a study of an outbreak of communicable disease is a "confidential record" within the meaning of § 4–101 of the Health–General Article ("HG" Article)....
>
> \* \* \*

Accordingly, the information is subject to the confidentiality strictures of HG § 4–102, to be discussed in more detail in response to other of your questions.

2. A document summarizing the results of an investigation of a communicable disease outbreak may be made public, subject to the restrictions in HG § 4–102(b). That is, the summary report may provide as full an account of the incident as you deem desirable, so long as the report does not "disclos[e] the identity of any person who is the subject of the confidential record."

*Because the terms "person" includes business entities, HG § 1–101(g), the version of the report that would be publicly available should not identify, for example, the establishment that was the source of contaminated food.* Of course, a version of the report containing full details, including identification of all persons involved, may be prepared for internal use and for the limited distribution permitted under HG § 4–102(a).

*Thus, in answer to an individual who requests a file or report of a specific outbreak—that is, one linked to an identified person—your response would be that pursuant to HG 4–101 and 4–102, the Department must keep confidential any such records if they exist.* The limitation applies to requests from the media for interviews or information about a disease outbreak.

In answer to a request for information on all outbreaks of a certain disease, your response would be that pursuant to HG §§ 4–101 and 4–102, the Department may release only summary reports that do not identify any person. In this situation you would release one or more reports, each addressing an outbreak of disease associated with a restaurant not identified in the summary. A request from the media for an interview or information about all outbreaks could be addressed in this same manner.

We note, however, that the Secretary is charged by HG § 18–103 with the duties of obtaining accurate and complete reports on communicable diseases in Maryland, determining the prevalence of each communicable disease, and "[d]e-

vis[ing] means to control communicable diseases." In order to safeguard the public health, the Secretary may determine that it is necessary to release information to the public that identifies a person. This release of information may be accomplished, for example, through press releases or media interviews and may alert the public to health-threatening products or conditions.

Such disclosure is authorized by law, and, in appropriate circumstances, would supersede the general bar to the disclosure of the identity of persons in HG §§ 4–101 and 4–102.

\* \* \*

6. As discussed in response to your second question, *the names of business entities or similar establishments are protected from public inspection* pursuant to HG §§ 1–101(g), 4–101 and 4–102.

We hope that this letter of advice, although not an opinion of the Attorney General, is fully responsive to your inquiry. Please let us know if we may be of further assistance. (Emphasis added).

On April 20, 1993, the Department's Epidemiology and Disease Control Program published and disseminated its "Guidelines for Release of Confidential Communicable Disease Information" ("the Guidelines"). That document, which "outline[d] how to process requests for confidential communicable disease information," echoed the interpretation articulated in the Attorney General's letter of advice. It stated, in part:

ROUTINE AND OUTBREAK–RELATED INSPECTIONS

While *routine* facility inspections are releasable, the inspection reports generated either in response to a complaint resulting in an outbreak investigation or as a part of the outbreak investigation itself are part of the outbreak file and are therefore confidential.

The Guidelines also included a diagram illustrating the Department's procedure for "Processing Requests for Confidential Communicable Disease Information", which we have at-

tached as an Appendix. By all accounts, the Department handled appellant's request according to the Guidelines.

On June 19, 1998, appellant filed a petition for judicial review in the Circuit Court for Baltimore County, pursuant to S.G. § 10–623.[7] On September 10, 1998, after the parties submitted memoranda of law in support of their respective positions, the court conducted a hearing. Acknowledging that the issue was one of first impression, the court held the matter *sub curia*. On September 25, 1998, the court filed a written Memorandum and Order, stating, in pertinent part:

> The legislative history and plain meaning of [S.G. § 10–615 and H.G. §§ 4–101, 4–102] make clear that, under the circumstances of this case, the identity of the person or persons involved in the investigation cannot be disclosed to the Plaintiff and that the legislative history as argued by the Plaintiff does not change this plain meaning.

> Perhaps the most important reasons for not divulging such information concern public policy. In carrying out its duties of determining the cause of disease, controlling disease, and otherwise protecting the public health pursuant to Health–General §§ 18–101 through § 18–103, DHMH gathers extensive information from many different sources, and medically, scientifically, and statistically analyzes this information to arrive at facts and conclusions about a disease outbreak. These facts and conclusions enable the health department to take measures to protect the public health and to recommend to those associated with the outbreak how illness can be prevented in the future.

> Maintaining confidentiality will allow the health department to gain and keep the cooperation of individuals and entities implicated in the outbreak so that information and bodily specimens and food samples for testing may be

---

**7.** State Government § 10–623(a) provides:

> Whenever a person or governmental unit is denied inspection of a public record, the person or governmental unit may file a complaint with the circuit court for the county where:
> (1) the complainant resides or has a principal place of business; or
> (2) the public record is located.

forthcoming. The information gathered and the resulting tests are crucial in carrying out a disease outbreak investigation for the protection of the public. Furthermore, DHMH has determined that devising means to control communicable diseases, as required by Health–General § 18–103, is an overriding health concern, and, to that end, provides outbreak information to any entity implicated in the outbreak to educate them about safe food handling practices in order to prevent subsequent outbreaks and to any federal agency that requires outbreak information for statistical or other public health purposes.

In deciding whether or not to divulge confidential information, DHMH had determined, pursuant to Health–General §§ 4–102, 18–101, 18–103, and 18–208, that those "engaged in the research" do not include an individual who may have been ill or provided a bodily specimen for testing. The Plaintiff argues that, the samples that she provided to DHMH were crucial in their investigation and discovery of the offending entity and that without the information from DHMH she will be severely hampered in her attempts to recover for her losses. However, it must be remembered that it is not the duty of the health department in carrying out a disease investigation to act as an investigative arm for those seeking evidence, even for the purpose of litigation.... Rather, it is the duty of DHMH to protect the public welfare by ensuring that the offending "person" is stopped from engaging in the particular practice that is or has the potential to cause harm.

\*　　　\*　　　\*

A thorough examination of all the pertinent statutes and terms lead[s] to the logical conclusion that the information sought by Ms. Haigley is in fact confidential, is not open to public inspection, and is subject to subpoena only pursuant to a court order sealing the court record. Therefore, the records can be used under court supervision only in enforcement procedures but are not available to Ms. Haigley for purposes of pursuing litigation.

Thereafter, appellant timely noted this appeal.[8] We shall include additional facts in our discussion.

## Discussion

 In 1970, the Maryland General Assembly enacted the PIA in order to "provide the public the right to inspect the records of the State government or of a political subdivision" within the State. *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506, 474 A.2d 880 (1984); *see* 1970 Md. Laws, Chap. 698; *A.S. Abell Publ'g Co. v. Mezzanote,* 297 Md. 26, 32, 464 A.2d 1068 (1983). State Government § 10–612 provides, in pertinent part:

**General Right to Information.**

(a) *General right to information.* All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

(b) *General Construction.* To carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest would result, this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection.

A "person in interest" is defined in S.G. § 10–611(e)(1) as "a person or governmental unit *that is the subject of a public record* or a designee of the person or governmental unit." (Emphasis added).

 In *Kirwan v. The Diamondback,* 352 Md. 74, 721 A.2d 196 (1998), the Court of Appeals reiterated that " ' "[t]he provisions of the Public Information Act reflect the legislative

---

8. In her reply brief, appellant brought to our attention a conflicting ruling made by another judge of the Baltimore County Circuit Court, rejecting the Department's interpretation of H.G. §§ 4–101 and 4–102. That case is now pending before this Court; *see Department of Health and Mental Hygiene v. Aslam et. al.,* No. 596, September Term, 1999. No argument date has yet been scheduled.

intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government." ' " *Id.* at 81, 721 A.2d 196 (quoting *Fioretti v. Maryland State Board of Dental Examiners*, 351 Md. 66, 73, 716 A.2d 258 (1998)(further citations omitted)). Moreover, the provisions of the statute must be " 'liberally construed ... in order to effectuate the Public Information Act's broad remedial purpose.' " *Kirwan*, 352 Md. at 81, 721 A.2d 196 (quoting *Mezzanote*, 297 Md. at 32, 464 A.2d 1068); *see Faulk*, 299 Md. at 506–507, 474 A.2d 880 (stating that "the basic policy" of the PIA is "in favor of disclosure"); *see also Fioretti*, 351 Md. at 76, 716 A.2d 258; *Mayor and City Council of Baltimore v. Maryland Committee Against the Gun Ban*, 329 Md. 78, 80–81, 617 A.2d 1040 (1993); *Cranford v. Montgomery County*, 300 Md. 759, 771, 481 A.2d 221 (1984).

State Government § 10–613 mandates that, "[e]xcept as otherwise provided by law, a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time." A "public record" is defined in S.G. § 10–611(g)(1) as

the original or any copy of any documentary material that:

(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and

(ii) is in any form, including:

1. a card;
2. a computerized record;
3. correspondence;
4. a drawing;
5. film or microfilm;
6. a form;
7. a map;
8. a photograph or photostat;
9. a recording; or
10. a tape.

Under the PIA, there are four provisions that may authorize the denial of a request for inspection. Nevertheless, because the PIA "establishes a public policy and a general presumption in favor of disclosure of government or public documents," *Kirwan*, 352 Md. at 80, 721 A.2d 196, the exemptions are interpreted narrowly. *Fioretti*, 351 Md. at 77, 716 A.2d 258. When a public official denies a request for records under the PIA, he or she bears the burden of showing, upon judicial review, "that the requested records are within the scope of a statutory exemption." *Faulk*, 299 Md. 493, 507, 474 A.2d 880 (1984); *accord, Fioretti*, 351 Md. at 78, 716 A.2d 258. We turn to review the exemptions.

First, S.G. § 10–616 requires a custodian to deny inspection of specific types of public records, including records related to adoption, retirement, and public personnel. Second, S.G. § 10–617 requires custodians to deny inspection of records that contain medical, psychological, or sociological information about a person, or that contain confidential commercial information, including trade secrets. Third, S.G. § 10–618 permits a custodian to deny inspection of particular types of public records if the custodian "believes that inspection . . . would be contrary to the public interest." S.G. § 10–618(a). The fourth exception, which is relied upon by the Department here, is found in S.G. § 10–615. That section provides:

**Required denials—In general.**

A custodian shall deny inspection of a public record or any part of a public record if:

(1) by law, the public record is privileged or confidential; or

(2) the inspection would be contrary to:

(i) a State statute;

(ii) a federal statute or a regulation that is issued under the statute and has the force of law;

(iii) the rules adopted by the Court of Appeals; or

(iv) an order of a court of record.

■ Recently, in *Gallagher v. Office of the Attorney General*, 127 Md.App. 572, 736 A.2d 350 (1999), we noted that the purpose of the PIA is " 'virtually identical' to that of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 and that interpretations of the federal statute are ordinarily persuasive." *Id.*, at 584, 736 A.2d 350 (quoting *Fioretti*, 351 Md. at 76, 716 A.2d 258). Therefore, we adopted "the standard of review applied by federal courts of appeals involving claims under the FOIA, which is (1) whether the trial court had an adequate factual basis for the decision rendered and (2) whether upon this basis the decision reached was clearly erroneous." *Id.* In contrast, "Pure legal errors ... are reviewed *de novo*." *Id.*

■ The Department claims that inspection of the documents requested by appellant is prohibited by S.G. § 10–615, because they are "confidential," pursuant to H.G. §§ 4–101, and not subject to disclosure under H.G. § 4–102. Health–General §§ 4–101 and 4–102 are found in Subtitle 1 of Title 4 of the Health–General Article. Title 4 is captioned "Statistics and Records"; Subtitle 1 is labeled "Confidential Research Records." Because our discussion focuses on the provisions of Subtitle 1, we reproduce it below in its entirety:

### § 4–101. "Confidential record" defined.

In this subtitle, "confidential record" means any record, report, statement, note, or other information that:

(1) is assembled or *obtained for research or study* by:

(i) The Drug Abuse Administration; or

(ii) The Secretary; and

(2) Names or otherwise identifies any person.

(Emphasis added).

### § 4–102. Confidential records protected.

(a) *Custody and use generally restricted.*—(1) Each confidential record shall remain in the custody and control of:

(i) The Drug Abuse Administration, if that Administration assembled or obtained the confidential record; or

(ii) The Secretary or an agent or employee of the Secretary, if the Secretary assembled or obtained the confidential record.

(2) *The confidential record may be used only for the research and study for which it was assembled or obtained.*

(3) A person may not disclose any confidential record to any person who is not engaged in the research or study project.

(b) *Exceptions as to summaries or references.* This section does not apply to or restrict the use or publication of any statistics, information, or other material that summarizes or refers to confidential records in the aggregate, without disclosing the identity of any person who is the subject of the confidential record.

(Emphasis added).

§ 4–103. **Penalties.**

A person who violates any provision of this subtitle is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000.

As the parties point out, Maryland's appellate courts have not yet interpreted H.G. §§ 4–101 and 4–102. Nor have we uncovered a Maryland case defining the terms "research" or "study."

The DHMH contends that the information sought by appellant was "obtained for research for study" because, in the course of carrying out its duty to protect the public health, the Department "gathers extensive information from many different sources and analyzes this information medically, scientifically, and statistically to arrive at facts and conclusions about a disease outbreak." In particular, the Department contends that the information it possesses about the source of appellant's exposure to hepatitis A was gathered as part of "research" and "study" focusing on the increase in hepatitis in Baltimore County, and not in connection with an investigation of appellant's particular illness. Indeed, it notes that appellant was one of several people whose illness was investigated by the Department. Moreover, appellee contends that the

information was collected in connection with "research" and "study" because the results of its investigation are used not only to confront health violations at the particular facility that may have transmitted the disease to appellant, but also to "identify and devise means to address new problems in food preparation, new disease agents and their sources, and new vehicles that transmit diseases."

The Department insists that, to the extent its investigations contain identifying information, such as the eating establishment from which appellant may have contracted her illness, these records must be kept confidential. Appellee states:

Maintaining ... confidentiality allows the health department to gain and keep the cooperation of individuals and entities implicated in the outbreak so that information, including bodily specimens and food samples for testing, is forthcoming. The information and test results obtained are crucial for DHMH to carry out not only the investigation of a specific disease outbreak but also to learn the information necessary to help prevent future outbreaks and thus protect the public health.

In effect, the Department's policy is to treat as confidential under H.G. § 4–102 any information "about outbreak investigations or other communicable disease investigations." This is because the Department construes the terms "research" and "study" to cover almost any investigative step taken in response to a report of food-borne illness. The Department's Guidelines, for instance, instruct DHMH staff to ask the following question in determining how to respond to a PIA request: "Is the requested information *about outbreak investigations or other communicable disease investigations (i.e., considered 'study')?*" (Emphasis added).

Appellee argues that we should defer to the Department's construction of the terms "research" and "study." *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g. den.* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). Citing *Webster's New World Dictionary* (2 d ed.1986), the Depart-

ment avers that "research" means "careful, systematic, patient study and investigation in some field of knowledge, undertaken to discover or establish facts or principles." The word "study" is defined in that dictionary as "careful attention to, and critical examination and investigation of, any subject [or] event."[9]

Appellant counters with numerous arguments to support her position that H.G. §§ 4–101 and 4–102 do not preclude the Department from disclosing to her the information generated or gathered by DHMH. In appellant's view, the Department's objective in its investigation was to correct health code violations that constitute a threat to public safety, not to conduct a "research project" on hepatitis A in Baltimore County. Claiming that the Department would not have begun an investigation had her doctor not reported her illness, appellant argues that the investigation conducted by the Department was authorized and controlled by Title 18 of the Health–General Article, entitled "Disease Prevention," and Subtitle 3 of Title 20, entitled "Nuisance Control." Moreover, despite the broad language contained in appellant's initial letter to the Department, Ms. Miller contends that the limited information she requested related only to the identity of the establishment from which she may have contracted hepatitis.[10] Therefore, appellant argues that disclosure would not jeopardize the privacy rights of a "person in interest" as defined in S.G. § 10–611(e)(1). Appellant also asserts that the trial court's "concern for public policy" was "misplaced", because the Department wields enormous power over its regulatees, so that disclosure would have a negligible effect on the Department's ability to enforce health code laws and regulations.

As we see it, the Department's view is at odds with the purpose of the PIA and H.G. §§ 4–101 and 4–102. Clearly,

---

9. We observe that, in H.G. §§ 4–101 and 4–102(a)(2), the words "research" and "study" are used as nouns. In H.G. § 4–102(a)(3) the words are used as adjectives modifying the word "project".

10. As we noted, appellant's written request to the Department sought much more than the mere identity of the eating establishment.

the Department's exegesis of H.G. §§ 4–101 and 4–102 has controlled its application of the provisions of the PIA. The deference we would ordinarily accord to the agency's interpretation of its own regulations is tempered by our obligation to safeguard the objectives of the PIA, which instructs us to construe its provisions "in favor of permitting inspection of a public record." S.G. § 10–612(b). Considering that the Department bears the burden of establishing an exception to the liberal disclosure provisions of the PIA, see *Faulk*, 299 Md. at 507, 474 A.2d 880; *Fioretti*, 351 Md. at 78, 716 A.2d 258, we believe the agency's position with respect to appellant's request conflicts with the Legislature's intent to make confidential only those documents actually related to "research" and "study." We explain further.

In resolving the parties' dispute, we must apply the well-honed principles of statutory construction. These principles undergird our resolution of the thorny issue presented here.

" 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State*, 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995)); see also *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 523, 709 A.2d 142 (1998); *Mayor and City Council of Baltimore v. Cassidy*, 338 Md. 88, 93, 656 A.2d 757 (1995); *Privette v. State*, 320 Md. 738, 744, 580 A.2d 188 (1990); *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 592, 723 A.2d 502, cert. denied, 353 Md. 473, 727 A.2d 382 (1999). As the Court recently said in *Martin v. Beverage Capital Corp.*, 353 Md. 388, 399, 726 A.2d 728 (1999), "[i]n determining legislative intent, we must never lose sight of the overriding purpose and goal of the statute." This is because "the search for legislative intent is most accurately characterized 'as an effort to "seek to discern some general purpose, aim, or policy reflected in the statute." ' " *Id.* (quoting *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987)(in turn quoting Melvin J. Sykes, *A Modest Proposal for a Change in Maryland's Statutes Quo*, 43 Md. L.Rev. 647, 653 (1984))).

To determine legislative intent, we look primarily to the statute itself. *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 570, 709 A.2d 749 (1998); *Allied Vending Inc. v. City of Bowie,* 332 Md. 279, 306, 631 A.2d 77 (1993); *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988). In doing so, "the Court considers the language of an enactment and gives that language its natural and ordinary meaning." *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994); *see Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Chesapeake and Potomac Tel. Co. v. Dir. of Fin.,* 343 Md. 567, 578, 683 A.2d 512 (1996); *Carroll County Ethics Commission v. Lennon,* 119 Md.App. 49, 67, 703 A.2d 1338 (1998); *Dept. of Econ. and Employment Dev. v. Taylor,* 108 Md.App. 250, 267, 671 A.2d 523 (1996), *aff'd,* 344 Md. 687, 690 A.2d 508 (1997).

Moreover, when analyzing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994); *see also State v. Thompson,* 332 Md. 1, 7–8, 629 A.2d 731 (1993) (courts must reach a statutory interpretation compatible with common sense). As the Court said in *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946 (1993) (internal citations omitted), "Giving the words their ordinary and common meaning 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence,' normally will result in the discovery of the Legislature's intent."

At oral argument, the Department's counsel contended that "all disease outbreak investigations" constitute "research and study" from their inception. When pressed to define how "disease outbreak investigations" differed from other sorts of investigations, appellee's attorney stated that the operative distinction was whether there was an "actual" outbreak, as opposed to a single report of illness. Counsel also suggested that for some diseases a single reported case is sufficient to constitute an "outbreak". We are not privy to a list of diseases for which a single occurrence is deemed an "outbreak." Based on the broad language in the Department's

Guidelines, however, it is clear that, from a practical point of view, very few investigations of reported communicable diseases fall outside of what the Department calls a "research" or "study" project.

To be sure, "[t]he consistent construction by [an] agency responsible for administering a statute is entitled to considerable weight." *National Asphalt Pavement Ass'n, Inc. v. Prince George's Cnty.*, 292 Md. 75, 80, 437 A.2d 651 (1981). That deference is premised on the notion that the agency has particular expertise in the area governed by the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 445, 697 A.2d 455 (1997). In this case, however, it is salient that the Department does not necessarily have any expertise with respect to the PIA.

Moreover, the weight accorded to an agency's interpretation of H.G. §§ 4–101 and 4–102 depends in part on the process by which the agency arrived at its conclusion. In this regard, it is noteworthy that the Department's interpretation of H.G. §§ 4–101 and 4–102 is the product of in-house deliberation between members of a committee formed by the Epidemiology and Disease Control Program, with input from the Attorney General's Office. The Department's Guidelines were completed in 1993, some twenty-three years after the enactment of the PIA. What the Court said in *Baltimore Gas & Elec. Co. v. Public Service Comm'n of Maryland*, 305 Md. 145, 501 A.2d 1307 (1986), is pertinent here:

The weight to be accorded an agency's interpretation of a statute depends upon a number of considerations. Although never binding upon the courts, the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time.

Another important consideration is the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation of the statute. When an agency clearly demonstrates that it has focused its attention

on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretation through a sound reasoning process, the agency's interpretation will be accorded the persuasiveness due a well-considered opinion of an expert body.

In addition, the nature of the process through which the agency arrived at its interpretation is a relevant consideration in assessing the weight to be accorded the agency's interpretation. *If the interpretation is the product of neither contested adversarial proceedings nor formal rule promulgation, it is entitled to little weight.*

*Id.* at 161–62, 501 A.2d 1307 (internal citations omitted)(emphasis added).

We are also mindful that an opinion of the Attorney General is "entitled to consideration in determining legislative intent" concerning a statute. *Mezzanote,* 297 Md. at 40, 464 A.2d 1068. But, as the Court in *Mezzanote* made clear, the Attorney General's view "is not binding upon the courts." *Id.* This is especially true when, as here, the Attorney General's letter of advice was co-authored by an attorney who was also appointed to the Department committee promulgating its Guidelines.

Appellee argues that three bills regarding the confidentiality of medical records that were considered but not passed by the Legislature in 1994, 1995, and 1996, "gave the legislature the opportunity to alter DHMH's position and to inform DHMH that its interpretation was incorrect." Although none of the bills was enacted, appellee argues that the Legislature's rejection of those measures demonstrated its acquiescence to the DHMH position regarding H.G. §§ 4–101 and 4–102, and created a "presumption that the DHMH interpretation is correct." We disagree.

House Bill 1647, introduced on February 28, 1994, would have amended the PIA at S.G. § 10–618 to require disclosure of "reports, statements, notes, or other information concerning an investigation of a food poisoning outbreak." In 1995, the General Assembly rejected H.B. 901, which would have

amended S.G. § 10–617 to make "communicable disease infor-
mation regarding communicable disease outbreaks, individual
diseases or conditions, or animal diseases or conditions of
importance to the public health" *not* subject to disclosure
under the PIA. Then, in 1996, S.B. 106 was introduced "to
allow for the release of certain information regarding food-
borne outbreaks." The bill proposed to amend H.G. § 4–101
by adding the following section:

> (B) "CONFIDENTIAL RECORD" DOES NOT IN-
> CLUDE ANY RECORD, REPORT, STATEMENT, NOTE
> OR OTHER INFORMATION THAT IS NOT A MEDI-
> CAL RECORD AS DEFINED IN § 4–301 OF THIS AR-
> TICLE PERTAINING TO A COMPLETED INVESTIGA-
> TION OF A FOODBORNE OUTBREAK THAT DOES
> NOT NAME OR OTHERWISE IDENTIFY AN INDI-
> VIDUAL.

As the Court said in *Sacchet v. Blan,* 353 Md. 87, 95, 724
A.2d 667 (1999), reliance upon "what the Legislature could
have done or upon what it has not done ... is almost always
... subject to arguably equally plausible interpretations",
especially when the interpreting court focuses on a "single,
contested phrase as if in a vacuum." The Legislature's "fail-
ure" to enact H.B. 1647 in 1994 could just as readily have
meant that the Legislature believed food poisoning investiga-
tion files were already subject to the PIA. We need not
entertain that conjecture. In our view, the Legislature's
inaction signifies only that the Legislature could not reach a
consensus as to the wisdom of the proposed bills.

In our effort to ascertain the scope of H.G. §§ 4–101 and 4–
102, we next consider that statute's history. Our effort has
yielded little help in resolving the pending dispute.

The provisions now found at H.G. §§ 4–101 and 4–102 were
originally enacted in 1963, by 1963 Md. Laws, Chap. 826.
That law, offered to the General Assembly as H.B. 61, added
§ 1–I to then Md.Code (1957, 1962 Repl.Vol.), Art. 43, and
provided, in pertinent part:

(a) All records, reports, statements, notes and other information *which have been assembled or procured by the State Board of Health and Mental Hygiene for purposes of research and study* and which name or otherwise identify any person or persons are confidential records within the custody and control of the Board and its authorized agents and employees, and may be used only for the purposes of research and study for which assembled or procured.

(b) It is unlawful for any person to give away or otherwise to disclose to a person or persons not engaged in such research and study for the Board, any of such records, reports, statements, notes or other information which name or otherwise identify any person or persons. Any person who violates any provision of this subtitle is guilty of a misdemeanor and upon conviction shall be fined not more than fifty dollars ($50).

(c) Access to and use of any such records, reports, statements, notes, or other information also are protected and regulated by the provisions of Section 101 of Article 35 and of Section 10 of Article 75C of this Code.

(d) Nothing in this section applies to or restricts the use or publicizing of statistics, data, or other material which summarize or refer to any such records, reports, statements, notes, or other information in the aggregate and without referring to or disclosing the identity of any individual person or persons.

(Emphasis added).

The 1963 law also added a provision to Article 35, entitled "Records of Health and Mental Research," as follows:

101. The records, reports, statements, notes, or other information described in Section 1-I of Article 43 of this Code, assembled or procured by the State Board of Health and Mental Hygiene for the purposes therein specified, are not admissible as evidence in any court or in any administrative hearing or procedure; and the employees or agents of the

Board shall not be compelled to divulge any of such records, reports, statements, notes, or other information.[11]

In 1982, the Legislature created the Health–General article. *See* 1982 Md. Laws, Chap. 21. Title 4 of the new article, captioned "Statistics and Records", contained four subtitles: Subtitle 1, "Confidential Research Records", contained the provisions at issue in this case; Subtitle 2 governed "Vital Statistics and Records"; Subtitle 3 addressed the "Confidentiality of Medical Records"; and Subtitle 4 contained provisions regarding "Personal Medical Records." The "Confidential Research Records" subtitle provided, in pertinent part:

4–101. "CONFIDENTIAL RECORD" DEFINED

IN THIS SUBTITLE, "CONFIDENTIAL RECORD" MEANS ANY RECORD, REPORT, STATEMENT, NOTE, OR OTHER INFORMATION THAT:

(1) IS ASSEMBLED OR OBTAINED FOR RESEARCH OR STUDY BY:

(I) THE DRUG ABUSE ADMINISTRATION;

(II) THE JUVENILE SERVICES ADMINISTRATION;

(III) THE SECRETARY; AND

(2) NAMES OR OTHERWISE IDENTIFIES ANY PERSON.

4–102 CONFIDENTIAL RECORDS PROTECTED.

(A) CUSTODY AND USE GENERALLY RESTRICTED.

(1) EACH CONFIDENTIAL RECORD SHALL RE MAIN IN THE CUSTODY AND CONTROL OF:

(I) THE DRUG ABUSE ADMINISTRATION, IF

---

11. This provision is now found in Md.Code (1974, 1995 Repl.Vol.), § 10–205(b) of the Courts and Judicial Proceedings Article, which states:

(b) Records, reports, statements, notes, or information assembled or obtained by the State Department of Health and Mental Hygiene, the Maryland Commission to Study Problems of Drug Addiction, the Medical and Chirurgical Faculty or its allied medical societies, the Maryland Institute for Emergency Medical Services Systems, an in-hospital staff committee, or a national organized medical society or research group that are declared confidential by § 4–102 of the Health–General Article or § 14–602 of the Health Occupations Article, are not admissible in evidence in any proceeding.

THAT ADMINISTRATION ASSEMBLED OR OBTAINED THE CONFIDENTIAL RECORD;

\* \* \*

(II) THE JUVENILE SERVICES ADMINISTRATION, IF THAT ADMINISTRATION ASSEMBLED OR OBTAINED THE CONFIDENTIAL RECORD.

(III) THE SECRETARY OR AN AGENT OR EMPLOYEE OF THE SECRETARY, IF THE SECRETARY ASSEMBLED OR OBTAINED THE CONFIDENTIAL RECORD.

(2) THE CONFIDENTIAL RECORD MAY BE USED ONLY FOR THE RESEARCH AND STUDY FOR WHICH IT WAS ASSEMBLED OR OBTAINED.

(3) A PERSON MAY NOT DISCLOSE ANY CONFIDENTIAL RECORD TO ANY PERSON WHO IS NOT ENGAGED IN THE RESEARCH OR STUDY PROJECT.

(B) EXCEPTIONS AS TO SUMMARIES OR REFERENCES.

THIS SUBSECTION DOES NOT APPLY TO RESTRICT THE USE OR PUBLICATION OF ANY STATISTICS, INFORMATION, OR OTHER MATERIAL THAT SUMMARIZES OR REFERS TO CONFIDENTIAL RECORDS IN THE AGGREGATE, WITHOUT DISCLOSING THE IDENTITY OF ANY PERSON WHO IS THE SUBJECT OF THE CONFIDENTIAL RECORD.

A "Revisor's Note" to the 1982 law explains that H.G. § 4–101 is composed of "new language that combines, without substantive change, the first and second clauses each of former Article 43, § 1–I(a), 43B, § 22(a), and 52A, § 8(b)." These provisions were "rephrased as a definition for clarity." Except for a minor amendment in 1987, which deleted reference to the abolished Juvenile Services Administration, Article 4, Subtitle 1 has remained unchanged since 1982. A comparison of the language of the 1963 law and the 1982 re-enactment illustrates that most of the changes were, indeed, stylistic.[12]

---

12. The 1982 law substituted "that" in H.G. § 4–101 for "which have been"; and "obtained" for "procured."

Nevertheless, appellant contends that use of the word "project" in the 1982 draft narrows the meaning of "research and study". Appellant states:

> [T]he word "project" was added during the Recodification to more narrowly define "research" and "study." It is clear that the General Assembly, in 1982, when they had a chance to do so, could have selected "case investigation" if it was their intent to exclude such information from a 'person in interest.' However, the word "project," where no substantive changes were made to former Article 43, Section 1–I, underscores that § 4–101 refers to "academic research projects" and not to case investigations.

Appellant also finds significant that the General Assembly shortened the phrase "for the purpose of research and study" to "for research and study."

In our view, these mild semantic differences shed no light on the Legislature's intent or the statute's meaning. "Project" is defined in the American Heritage Dictionary (3d ed.1994) as "[a] plan or proposal; scheme ... An undertaking requiring concerted effort." *Id.* at 661. But, an "undertaking" need not be "academic" in order to constitute a "project." Moreover, the Legislature's substitution of the phrase "for research and study" underscores, at most, that when the Legislature originally enacted the confidentiality provision, the reason for which information was gathered was crucial in determining whether it was confidential. That observation only begs the question: What is "research" or "study"? Specifically, does "research" or "study" encompass what the Department does in response to a report of a particular instance of communicable disease?

In the absence of bill files, committee reports, or persuasive linguistic guidance, we return to the principles of statutory construction. We are left to render a common sense interpretation of the terms "research" and "study," in light of the "overriding purpose and goal of the statute," *Martin, supra,* 353 Md. at 399, 726 A.2d 728, and consistent with the principles of statutory construction. In our view, the place-

ment of H.G. §§ 4–101 and 4–102 in Title 4, as opposed to Titles 18 and 20 of the Health–General article, indicates that H.G. § 4–102 was not meant to apply to "case investigations" authorized and conducted pursuant to titles 18 and 20 of that article.

The Department functions in an advisory capacity, evaluating threats to public health, and as an investigative arm of State government, enforcing health and safety provisions in order to stem the increase of communicable disease. When the General Assembly created the State Board of Health in 1874, it described its duties in the following way:

> *And be it enacted,* That the State Board of Health shall take cognizance of the interests of health and life among the people generally; *they shall make sanitary investigations and inquiries respecting the causes of diseases,* especially of epidemics, the sources of mortality and the effects of localities, employments, conditions, and circumstances on the public health, and they shall gather such information in respect to these matters as they may deem proper; they shall devise some scheme whereby medical and vital statistics of sanitary value may be obtained, *and act as an advisory board to the State in all hygienic and medical matters.*

1874 Md. Laws, Chap. 200 (emphasis added).

The Department of Health and Mental Hygiene was formed in 1969, by 1969 Md. Laws, Chap. 77. Titles 18 and 20 of the Health–General article empower the Department to investigate specific incidents that may threaten public health, and to enforce health regulations promulgated by the Department. Health–General § 18–101 charges the Department with the responsibility to conduct "investigations into causes of disease and mortality." Health–General § 18–102(a) provides:

> *Rules and regulations.*—The Secretary shall adopt rules and regulations necessary to prevent:
>
> (1) The introduction of an infectious or contagious disease into this State; or

(2) The spread of an infectious or contagious disease in this State.

In order to carry out its mandate, the Department is given broad power to "enter on and inspect private property to determine the presence, cause, and source of an infectious or contagious disease." H.G. § 18–102(b). In addition, local health officers are required to take immediate action when they become aware of a potential public health threat. Health–General § 18–208 provides, in pertinent part:

**General duties.**

(a) *Dangerous diseases.*—(1) When a health officer has reason to believe that a disease that endangers public health exists within the county, the health officer shall:

(i) Report immediately to the appropriate county board of health; and

(ii) With the approval of the board:

1. investigate the suspected disease; and

2. Act properly to prevent the spread of the disease.

(b) When a health officer is notified of an infectious or contagious disease within the county, the health officer:

(1) Shall act immediately to prevent the spread of the disease;

(2) Within 24 hours after receiving notice of the disease, shall give the Secretary all information obtained on the disease; and

(3) Shall cooperate with the Secretary to prevent the spread of the disease.

(c)(1) When a health officer knows of any unusual disease or mortality in the county or a contiguous county, the health officer promptly shall give the Secretary notice of the disease or mortality.

(2) if a health officer is unsure whether a disease is infectious or contagious, the health officer shall notify the Secretary.

Likewise, H.G. § 20–301 *et seq.* charges the Department with the duty to prevent health nuisances. Health–General § 20–301 provides that the Secretary of DHMH "is responsible for the general care of the sanitary interests of the people of the State." Like Title 18, Title 20 gives the Department the right to inspect private property "to determine whether a nuisance exists." H.G. § 20–304. Moreover, the Department "may bring an action to enjoin any person from committing any nuisance subject to the article," H.G. § 20–305, and to "summarily abate ... any condition that is in a state of nuisance under this subsection." H.G. § 20–308.

Significantly, titles 18 and 20 do not contain a blanket provision making confidential *all* information gathered in the process of carrying out the Department's authority under those articles. Rather, title 18 declares, in piecemeal fashion, that particular types of information are confidential. For example, H.G. §§ 18–201, 18–202, and 18–205 provide that reports of infectious or contagious diseases made by physicians, institutions, and medical laboratories are "confidential" and "not open to public inspection." Similarly, H.G. § 18–207 provides:

**Human immunodeficiency virus.**

The director of a medical laboratory in which serum samples are tested for human immunodeficiency virus may not disclose, directly or indirectly, the identity of any individual tested for human immunodeficiency virus in any report submitted to the Department or the health officer for the county where the laboratory is located.

Each of these provisions makes confidential what would already be covered under H.G. §§ 4–101 and 4–102, if we were to adopt the Department's definition of "research" and "study" in Title 4.

On the scant record before us, we consider it likely that when the Department interviewed appellant in the hospital,

obtained a list of potential sources of contamination, and inspected various restaurants in Baltimore County, the Department "assembled" and "procured" that information "for the purpose of" identifying the offending establishment and enforcing health code regulations designed to prevent further outbreaks, pursuant to titles 18 and 20. This is true even if the Department also incorporated the data in a "study" of the rise of hepatitis A in Baltimore County.

The recent case of *Kirwan v. The Diamondback, supra,* 352 Md. 74, 721 A.2d 196, illustrates that the PIA's preference for disclosure mitigates against any interpretation that would expand the scope of an enumerated exception to the Act. There, the *Diamondback,* a campus newspaper of the University of Maryland, College Park (the "University"), requested documents from the University related to the paper's investigation of reports that members of the men's basketball team "were parking illegally on campus ... and were receiving preferential treatment from the University with respect to the ... fines imposed," and that a student-athlete had accepted money from a former coach to pay his fines. *Id.* at 79, 721 A.2d 196. Specifically, the paper sought: 1) correspondence between the University and the NCAA involving the student-athlete who was suspended for accepting payment of his fines; 2) records related to on-campus parking violations committed by other members of the team; and 3) records of parking violations committed by the team's head coach. *Id.* The University denied disclosure, claiming that the coach's parking tickets were exempt as "personnel records" pursuant to S.G. § 10–616(a)(*i*). In rejecting the University's argument, Judge Eldridge, writing for the Court, relied on a common sense interpretation of "personnel records":

> As previously discussed, the policy of the Public Information Act is to allow access to public records. Generally, the statute should be interpreted to favor disclosure. In light of this policy, we do not believe that the General Assembly intended that any record identifying an employee would be exempt from disclosure as a personnel record. Instead, the General Assembly likely intended that the term "personnel

records" retain its common sense meaning. This is indicated by the list following the prohibition on the release of the personnel records.

*Id.* at 84, 721 A.2d 196. (Emphasis added). The Court also rejected the University's argument that, under S.G. § 10–618, it was permitted to deny *The Diamondback's* request because disclosure would have a " 'chilling effect on the University's obligation to self-report any NCAA violations' and 'would discourage students from coming forward to admit to or advise the University about potential NCAA rules violations.' " *Id.* at 87–88, 721 A.2d 196.

As in *Kirwan,* we believe that the "common sense meaning", of the words "research" and "study" in H.G. §§ 4–101 and 4–102 connote the sort of academic inquiry the Department engages in when it reports on the causes and effects of disease in the State. Moreover, although the Department does not rely on the "public interest" provision of S.G. § 10–618, its fear of a "chilling effect" provides no more basis for a denial of appellant's request than was present in *Kirwan.* Therefore, we are not persuaded that the confidentiality provisions of Title 4 encompass, *in toto,* these essentially investigatory functions of the DHMH as they relate to reports of food-borne illness.

We also agree with appellant that the Department's desire to maintain the confidentiality of records that identify persons who are the subject of case investigations, in order to foster cooperation from persons who may be spreading infectious disease, is not a sufficient ground upon which to avoid disclosure under the PIA. The trial court relied almost exclusively on this "concern for public policy" in construing the statute, stating that "confidentiality will allow the health department to gain and keep the cooperation of individuals and entities implicated in the outbreak so that information and bodily specimens and food samples for testing may be forthcoming." If we were to adopt the Department's interpretation, almost all of the Department's investigative functions would be shielded from disclosure. The Department is with-

out authority to circumvent the PIA's disclosure provisions in the name of administrative efficiency, nor may it become a fortress of secrecy immune from the PIA by virtue of its mission to investigate dangers to our collective health. Moreover, the investigative powers of the DHMH, set forth in articles 18 and 20, are sufficient to compel cooperation from those subject to the Department's purview.

In our view, the Department is not entitled to deny Ms. Miller access to the identity of the restaurant that may have contaminated her on the ground that the entire "outbreak investigation" file is a product of "research" or "study", as those terms are used in H.G. §§ 4–101 and 4–102. In this regard, the Department has misconstrued the scope of H.G. §§ 4–101 and 4–102, and its Guidelines thus subvert the provisions of the PIA. Accordingly, to the extent that appellant sought to obtain from the Department the identity of the restaurant from which she may have contracted hepatitis, and to the extent the Department ascertained the identity of the establishment in connection with its investigative function under titles 18 and 20 of the Health–General article, we conclude that the information is not "confidential" under H.G. §§ 4–101 and 4–102. Therefore, the Department was not permitted to prohibit disclosure of such information to appellant on the ground that disclosure was barred under S.G. § 10–615.

We note, however, that appellant's written PIA request to the Department was expansive in scope; Ms. Miller asked for "records pertaining to the recent increase in Hepatitis A in Baltimore County." Conceivably, an enormous number of documents could "pertain" to "the recent increase in Hepatitis A in Baltimore County." Although appellant apparently spoke on the telephone with Carmela Groves about her request, the record does not reveal whether the Department actually knew that, despite the content of the written request, appellant was primarily interested only in the information related to the identification of the particular restaurant that may have made her ill. Regardless, S.G. § 10–614(a) provides

that "[a] person ... that wishes to inspect a public record shall submit a *written* application to the custodian." (Emphasis added).

Moreover, apart from correspondence between Ms. Miller and Ms. Groves, the documentary "evidence" placed before the trial court only consisted of three exhibits attached to the Department's memorandum of law: 1) Diane Dwyer's March 27, 1991 letter to the Attorney General; 2) the Attorney General's response; and 3) a copy of the Department's Guidelines. Significantly, the lower court did not review the Department's documents *in camera,* nor did the Department submit an index or summary to the court describing the content of the material in issue. In *Cranford v. Montgomery County, supra,* 300 Md. 759, 481 A.2d 221, the Court of Appeals underscored the variety of options available to a trial judge reviewing an agency's denial of a PIA request. It said: "[T]he ultimate standard under the [PIA] for determining whether an *in camera* inspection is to be made is whether the trial judge believes that it is needed in order to make a responsible determination on claims of exemptions." *Id.* at 779, 481 A.2d 221. If the trial court finds that the documents at issue are voluminous, the court may, in the interest of judicial economy, direct the agency to "furnish such further affidavits, indices, tables, summaries, and cross references as the trial judge believes will be of help to him." *Id.*[13]

Due to the procedural posture of this case, a host of relevant facts remain unknown. We do not know, for instance, what subdivision of the DHMH investigated appellant's case, or whether appellant's diagnosis was the one that prompted the original investigation. Although appellant's written request encompassed more than the identity of the establishment in question, we have no way of knowing what portion of the Department's file is responsive. Moreover, of

---

**13.** Summaries of this sort are sometimes referred to as a "Vaughn index." *Gallagher, supra,* at 575 n. 1, 736 A.2d 350; *see Cranford,* 300 Md. at 779, 481 A.2d 221; *see also Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

the documents that might be responsive to appellant's broad petition, we cannot determine which, if any, were gathered pursuant to the Department's investigative function under titles 18 and 20, as opposed to "research" and "study", as described in H.G. §§ 4–101 and 4–102. Although DHMH was not necessarily entitled to deny appellant's entire request as to *all* of the records encompassed in appellant's letter, parts of the request may well have been "confidential" under the PIA.

In view of the foregoing, we conclude that the Department erred in its interpretation of H.G. §§ 4–101 and 4–102. Nevertheless, because of the absence of a developed record, it is impossible for us to determine whether the Department's denial of appellant's request, *in toto*, violated the PIA. It follows that, pursuant to Rule 8–604(d), a remand is appropriate. That rule provides:

> If [an appellate court] concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court.... Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court.

For the reasons set forth herein, we shall vacate the judgment and remand the matter to the trial court for further proceedings consistent with this opinion.

**JUDGMENT VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**

APPENDIX

**Guidelines for Release of Confidential
Communicable Disease Information**

Processing Requests for Confidential Communicable
Disease Information: Flow Diagram

1. Is the requested information a "medical record" being requested by a "person in interest?"

yes — Release only that person's medical record.

no —

2. Is the requested information about outbreak investigations or other communicable disease investigations (i.e., considered "study")?

yes —

3. a. Is requestor engaged in the study project;
 b. Is requestor the implicated entity; or
 c. Does it serve public health interests to release the information?

no — Follow Public Information Act (PIA) to determine if request should be granted or denied

yes — Release information.

no —

4. Is the request for general information about outbreaks (i.e., not a request for information about a specific outbreak)?

yes — Delete all references that might identify a "person" (the location, etc.) and follow Public Information Act to determine if request should be granted or denied.

no — Deny release of information.