REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1078

September Term, 2012

COMPTROLLER OF THE TREASURY

v.

HENRY IMMANUEL

Krauser, C.J.,
Matricciani,
Nazarian,

JJ.

Opinion by Nazarian, J.

Filed: January 29, 2014

The Maryland Uniform Disposition of Abandoned Property Act[1] (the "Abandoned Property Act") directs the Comptroller of the Treasury ("Comptroller") to maintain a division for managing unclaimed property. The Abandoned Property Act renders the Comptroller the legal custodian of millions of dollars' worth of unclaimed property, including stocks, bonds, savings accounts, security deposits, contents of safe deposit boxes, insurance proceeds, and other valuables that are reported as unclaimed by banks and other financial institutions.[2]

Henry Immanuel is engaged in the business of locating the owners of unclaimed property held by the Comptroller and, then, for a fee, reuniting them with their former possessions. To further his business, Mr. Immanuel asked the Comptroller, under the Public Information Act,[3] to produce to him a list of the names and addresses of those entitled to the 5,000 most valuable property accounts, "formatted from largest account values to smallest account values," but excluding the precise value of each item. The Comptroller denied his request on the ground that the request would require him to disclose the "financial information" of property owners to a third party. In the circuit court, the Comptroller also argued that producing the data as Mr. Immanuel requested would require the Comptroller to "create" a new record, which the Public Information Act does not require him to do.

---

[1] Md. Code (1975, 2005 Repl. Vol., 2012 Supp.), §§ 17-101 to 17-326 of the Commercial Law Article ("CL").

[2] *See* Comptroller of Maryland, https://interactive.marylandtaxes.com/Individuals/ Unclaim/default.aspx (last visited on December 18, 2013).

[3] Md. Code (1984, 2009 Repl. Vol., 2012 Supp.), §§10-611 to 10-630 of the State Government Article ("SG").

Mr. Immanuel filed a petition for judicial review of the Comptroller's decision in the Circuit Court for Wicomico County. After a hearing, the circuit court decided that Mr. Immanuel's request should have been granted and ordered that the Comptroller "provide the unclaimed property records in the manner requested." The Comptroller appeals, renewing his claims that the request would require the Comptroller to "create" a new public record and require the Comptroller to disclose the financial information of property owners to third parties. We disagree with the Comptroller that Mr. Immanuel's request compels the Comptroller to "create" a new public record, and we hold that, in light of the Abandoned Property Act, the request seeks information that the Comptroller is required to disclose. That said, we also hold that a list sorted by dollar value would reveal additional individual financial information Mr. Immanuel is not entitled to have, and we find that his request may be overbroad in one other way as well. So although Mr. Immanuel is entitled to the bulk of the information he has requested, we reverse the judgment of the circuit court and remand for further proceedings for the limited purpose of determining the precise scope and format of the list the Comptroller must produce.

## I. BACKGROUND

In his role as legal custodian of millions of dollars' worth of unclaimed property, the Comptroller enters and stores in a database information regarding the property he is holding and who might be entitled to claim it. As the Comptroller receives each piece of abandoned property, his staff logs data about the property, its value, and the likely owner into the

2

Comptroller's database. The Comptroller is required by the Abandoned Property Act to publish annually, in local newspapers, the names and last known addresses of those individuals who appear to be the owners of property valued at $100 or more,[4] although the published list does not disclose either the nature of unclaimed items of property or their value.

Mr. Immanuel is a "tracer," someone who locates the owners of unclaimed property held by the Comptroller and, for a fee, assists those people in obtaining their property. On November 3, 2011, Mr. Immanuel sent a letter to the Comptroller requesting "a printout of all unclaimed property accounts" that had been unclaimed for two years or longer. In addition to requesting publicly available information—specifically, the names and last-known addresses of those entitled to the property—he asked the Comptroller to format the list "from largest account values to smallest account values" and to provide him "with the listing of the top 5,000 accounts after this formatting is done." In his request, Mr. Immanuel acknowledged that the Public Information Act prohibited him from receiving "information

---

[4] The Abandoned Property Act requires the Comptroller, within 365 days of receiving a report from a holder of property presumed to be abandoned, to "cause notice to be published in a newspaper of general circulation in the county in the State within which is located the last known address of any person to be named in the notice." CL § 17-311(a)(1). The published notice must have "[t]he names in alphabetical order and last known addresses, if any, of persons listed in the report and entitled to notice in the county specified in this section." CL § 17-311(b)(1). The notice must also include "[a] statement that information concerning the amount or description of the property and the name and address of the person who held the property may be obtained by any person who possesses an interest in the property." CL § 17-311(b)(2). Moreover, the Comptroller is generally "not required to publish in the notice any item valued at less than $100." CL § 17-311(c).

3

concerning the specific value of each account or a description of the property," and he asked

that, once the list was sorted, the specific values be removed. Although the Comptroller,

with the help of his information technology ("IT") department, has the ability to perform Mr.

Immanuel's request, the Comptroller denied it.

Since 1978, Mr. Immanuel has submitted requests asking for lists of names and

addresses sorted by value. The Comptroller granted those requests until 1992. That year,

however, the Attorney General issued an opinion stating that the Public Information Act

prohibited the Comptroller from disclosing the monetary value of individual items of

unclaimed property to members of the public.[5] Mr. Immanuel, nonetheless, made five other

requests in the years since, all five of which, including the one at issue, the Comptroller

denied.

Mr. Immanuel filed a petition seeking judicial review of the Comptroller's most recent

denial in the Circuit Court for Wicomico County. The court held a hearing and took

testimony from Mr. Immanuel and Eric Eichler, the Assistant Manager of the Comptroller's

Unclaimed Property Unit. According to Mr. Eichler, the Comptroller's IT staff logs

---

[5] In 1992, the Office of the Attorney General issued an opinion interpreting SG § 10-617(f)(2) as prohibiting the Comptroller "from disclosing the value or description of assets reported to it as abandoned property, other than to the owner or the owner's designee." 77 Op. Att'y Gen. 188 (1992). The Attorney General further advised that the Comptroller is prohibited from disclosing "personal financial information" and declared that "[i]t is self-evident that a list showing how much money or what type of property people have left unclaimed reveals information about 'assets' of those people." *Id.* "Indeed," continued the Attorney General, "this office has concluded in the past that the bare fact of ownership of an asset is ordinarily nondisclosable under SG § 10-617(f)(2)." *Id.*

4

information about each piece of unclaimed property into a database as the Comptroller receives it. From there, the IT staff can extract and sort data from the database, and does so for non-agency requesters with enough regularity that he maintains (and publishes on a "form letter") a schedule of fees. Mr. Eichler acknowledged that the Comptroller maintains "a list available for the public if they need to, but it's not sorted by dollar value." He also testified that the Comptroller extracts and produces lists from this database in batches of 10,000 records in the normal course, for which it charges $500,[6] and that the Comptroller's fee schedule includes at least some forms of sorting. ("Q. But if my client were willing to pay for the [dollar-value] sort, doesn't this fee schedule cover that potential? A. Yes, depending on what the sort is, I assume.")

At the conclusion of the hearing, the circuit court declared that "[t]aking the additional step of formatting the list before redacting the financial information does nothing to reveal prohibited information." Then, observing that "disclosure of public records is favored" in Maryland, the court granted Mr. Immanuel the relief he sought and ordered the Comptroller to provide him with the information in the format he had requested.

---

[6] Indeed, at an earlier point in the life of this request, the Comptroller apparently offered to produce 10,000 records to Mr. Immanuel for $500, and Mr. Immanuel had obtained a money order in that amount before the Comptroller decided to deny the request altogether.

## II. DISCUSSION

The Public Information Act grants the public the right to inspect public records in a way that favors public access. *Md. Dep't. of State Police v. Md. State Conference of NAACP Branches*, 190 Md. App. 359, 367 (2010). Under the act, "'[p]ublic record' means the original or any copy of any document material that: (i) is made by a unit or instrumentality of the State government . . . and (ii) is in any form, including: . . . 2. a computerized record," SG § 10-611(h), and the Comptroller does not dispute that the information Mr. Immanuel seeks satisfies that definition. At the same time, the Public Information Act does not "require a custodian to create, compile, or program a new record"[7] upon request by a member of the public, SG §10-620(a)(2)(iv)(3), and it prohibits a custodian of public records from disclosing the part of a record that contains "information about the finances of an individual." SG § 10-617(f)(2). We review a circuit court decision reviewing an agency's response to a Public Information Act request to determine whether that court had an adequate factual basis for the decision it rendered and whether the decision the court reached was clearly erroneous. *Haigley v. Dep't of Health & Mental Hygiene*, 128 Md. App. 194, 210 (1999). We review *de novo* any purported errors in interpreting the Act itself. *Id.*

The Comptroller presents two questions on appeal:

---

[7] The relevant language in SG § 10-620 was, but no longer is, legislatively scheduled to end on September 30, 2013. In the 2013 session the General Assembly repealed this termination date. 2013 Md. Laws, Chap. 459.

6

1.  Did the circuit court err in ordering the Comptroller to disclose a record that did not exist and that the Office of the Comptroller would have to create, when the Public Information Act does not require the creation of records?

2.  Did the circuit court err in ordering the Comptroller to disclose a record containing financial information about individuals, when the Public Information Act prohibits disclosure of such information?

At its core, Mr. Immanuel's request seeks information that the Comptroller is required to disclose. As we explain, the request overreaches to the extent it asked for the data to be rank-ordered by value and, potentially, by asking for the top 5,000 claims rather than tying the request to the $100 threshold prescribed in the Abandoned Property Act. *See* CL § 17-311(c). But the marginal overreaching is not a reason to deny the request altogether, as the Comptroller did. To the contrary, the Public Information Act directs State agencies to "permit inspection of any part of the record that is subject to inspection and is reasonably severable." *See* SG § 10-614(b)(3)(iii); *see also Governor v. Washington Post Co.*, 360 Md. 520, 545 (2000); *Prince George's County v. Washington Post Co.*, 149 Md. App. 289, 320 (2003). Rather than reversing the judgment of the circuit court outright, which has the effect of affirming the Comptroller's decision to deny the request *in toto*, we reverse and remand for further proceedings for the purpose of determining the appropriate scope and mechanics of the Comptroller's production. We reach this result for two reasons.

*First*, although the Comptroller has preserved his argument that Mr. Immanuel's request seeks a new public record, we disagree with it. According to the Comptroller's own

7

witness, the Comptroller gathers and maintains the information Mr. Immanuel has requested in the normal course and stores that information in a database from which the information can be (and is, for a price) extracted, sorted, and produced. The process of extracting or sorting the information Mr. Immanuel requests from this database is no different in principle than the process of producing something less than the full contents of a paper file. Mr. Immanuel must, of course, pay the appropriate fee (the Comptroller maintains a fee schedule for exactly this purpose and has not argued that the request is not feasible or would cause him an undue burden), but the Comptroller may not withhold information contained in his abandoned property claims database on the ground that extracting or sorting otherwise responsive data from that database would require him to create a new public record.

*Second*, we cannot reconcile the statutory disclosure requirements of the Abandoned Property Act with the Comptroller's decision to withhold the identical information under the Public Information Act. Specifically, although the Public Information Act forbids the Comptroller from providing a list of abandoned property claims because that list would reveal individual financial assets, *see* SG § 10-617(f)(2), the Abandoned Property Act requires the Comptroller to publish annually an alphabetical list of abandoned property owners with claims greater than $100, *see* CL § 17-311(c). The circuit court record does not reveal whether Mr. Immanuel has requested more information than the Comptroller is required to publish—neither he nor the Comptroller produced or proffered any evidence from which the circuit court (or we) could tell whether the 5,000 largest claims fall above or stray

8

below the $100 threshold—and we hold that Mr. Immanuel's request for a rank-ordered list would reveal a modicum of additional individual financial information beyond the Abandoned Property Act disclosure. But these problems render the request overbroad, not objectionable, so we direct the circuit court to flesh out the record and draw the appropriate boundaries.

### A. The Comptroller Preserved His Argument That The Request Would Require Him To Create A New Record.

Before considering the Comptroller's initial question, we first address whether the Comptroller preserved it. Mr. Immanuel argues that the issue was not properly preserved, but we disagree. *See* Md. Rule 8-131(a).

At the hearing below, the circuit court asked counsel for the Comptroller whether he was arguing that it would have to reformat its existing list of unclaimed property accounts to comply with Mr. Immanuel's request. Counsel for the Comptroller responded that he was:

> Well, I think to the extent that it's not an existing document. I think that that is an element of the Court's review, and that is . . . that Mr. Immanuel is not only requesting documents or information, he is asking the State to format this information in a form that does not currently exist.

> \*\*\*

> If Mr. Immanuel wanted the information that's available on the Comptroller's data systems, it would just . . . be a list presented in chronological order, and that's how the Comptroller stores that information.

> I think that this is not a typical request for information from a State agency. This is a request for the State agency to sort and

9

format data in a format that would benefit the tax payer, and it's not something the State is in the business of doing.

So that's a corollary argument, Your Honor, but the reason the information was not disclosed is basically because the Comptroller believes it is prohibited by statute based upon the Attorney General's Opinion.

In its order, the circuit court stated that "[a]t the hearing, counsel for [the Comptroller] stated that the denial was not based on the request that the [Comptroller] format the list; only that the list, when formatted, would reveal asset information." We disagree. It is clear from the record that the Comptroller did, in fact, decline to grant Mr. Immanuel's request on the ground that the agency was being compelled to create a new document, and we find that the Comptroller's contention was preserved for appellate review.

**B.      Mr. Immanuel's Request Does Not Require The Comptroller To Create A New Public Record**.

Although the Comptroller preserved his argument, we respectfully disagree with it. Putting aside Mr. Immanuel's motives,[8] his request is straightforward: he asked for "a printout of all unclaimed property accounts (owners, their last known address, the date the account was referred to the State, and any other information that is published each year

---

[8] It makes no difference that Mr. Immanuel seeks public information to pursue his business rather than for some higher-minded purpose. The unsolicited contacts we all receive from people claiming to be exiled royalty or estate lawyers for long-lost foreign relatives could well cause one to view cynically an unsolicited offer to collect abandoned property from the State government. But public information is, at least within the bounds defined by the Act, available to the public, and other bodies of law protect the public from those who would misuse that information if it is otherwise appropriate to disclose it.

pursuant to statute) that have been with your agency for 24 months or more," and asked the Comptroller "to have this data formatted from largest account values to smallest account values" and for "the listing of the top 5,000 accounts after this formatting is done." The Comptroller does not dispute that he collects and maintains the information Mr. Immanuel requested in the normal course, nor does he dispute that the information qualifies as a "public record" subject to the Public Information Act. *See* SG § 10-611(h). As such, the Public Information Act requires the Comptroller to disclose these public records unless they fall within a recognized exclusion—or, put another way, to disclose unless "an *unwarranted* invasion of the privacy of a person in interest would result." SG § 10-612(b) (emphasis added). Note the term "unwarranted": the Public Information Act respects individual privacy, but balances that critically important concern against the independent, and also critical, public interest in transparency in government.

The Comptroller argues, as a mechanical matter, that producing the information Mr. Immanuel requests would impermissibly require him "to create, compile, or program a new public record." *See* SG § 10-620(a)(2)(iv)(3). This subsection has not been construed or applied in any reported cases, but reviewing the record (and especially the uncontradicted testimony of the Comptroller's hearing witness, Mr. Eichler) against the everyday definitions of the three operative terms—create, compile, and program—leads us to conclude that this request would *not* require the Comptroller to create a public record.

11

The first two are easy. Mr. Immanuel has not asked the Comptroller to *create* or *compile* anything,[9] but rather to extract a subset of the abandoned property data that, according to Mr. Eichler, the Comptroller loads into a database as it receives the information from the parties holding the property. The request does not require the Comptroller to generate new data, perform any analysis on existing data, or even to gather disparate pieces of information stored elsewhere into one new place. He asks only that the Comptroller produce data that the Comptroller already keeps within one database and that, as we discuss in greater detail below, the Comptroller is already required by statute to gather and publish annually.

The record also reveals that Mr. Immanuel's request would not require the Comptroller to *program* a *new record*.[10] Again, Mr. Eichler acknowledged that the Comptroller's IT department extracts data from this database, performs IT work for non-agency requesters frequently enough to justify publication of a standard fee schedule, maintains "a list available for the public if they need to, but it's not sorted by dollar value," and even offered to produce 10,000 records to Mr. Immanuel for $500 before deciding ultimately to deny the request. Where, as here, the Comptroller's database and IT staff can perform the data extraction and sorting Mr. Immanuel requested within their existing

---

[9] To "create" is "to bring into existence," Merriam-Webster Collegiate Dictionary 293 (11th ed. 2011), and to "compile" is "to compose out of materials from other documents," *id.* at 253.

[10] To "program" is "to work out a sequence or operation to be performed by (a mechanism)." Merriam-Webster Collegiate Dictionary 992.

functionality and in the normal course, we cannot agree that any new programming is required.

We doubt this request would raise a "new record" concern if Mr. Immanuel were seeking information that the Comptroller maintained in a paper file in a drawer. *See, e.g.*, *Md. Dep't of State Police v. Md. State Conference of NAACP Branches*, 430 Md. 179, 194-96 (2013) (ordering state police to produce personnel records with information redacted); *Governor v. Washington Post*, 360 Md. at 542-43, 550 (ordering the production of redacted records of phone calls made from the State House by the governor, the chief of staff, and the senior advisor); SG § 10-614(b)(3)(iii) ("A custodian who denies the application [to inspect public records] shall . . . permit inspection of any part of the record that is subject to inspection and is reasonably severable."). In that (uncontroversial) instance, the Comptroller and his staff would review the file as a whole, then copy and prepare any responsive portions for production. The only functional difference between that hypothetical and this case is that IT professionals would perform here the work that clerical professionals would perform on a paper file—a difference that almost certainly reduces the burden on the agency (and the Comptroller does not oppose this request on burden grounds in any event). We see no analytical difference between the two cases.

Under different circumstances—for example, if Mr. Immanuel had asked the Comptroller to perform calculations with the data or summarize or analyze the data (for example, to add up the number of records or the overall value of the unclaimed property), or

if the request would have required extraction or sorting beyond the existing capabilities of the Comptroller's database—we might have found that fulfilling such a request would require the Comptroller to create a new record. And as we explain below, we hold that requiring the Comptroller in this case to produce a list sorted by dollar value *would* reveal individual financial information that the Act protects from disclosure. But we disagree that the mere act of extracting, sorting, or formatting data the Comptroller collects and maintains in a database requires him to create a new record. In the context of the Comptroller's database, Mr. Immanuel's formatting and sorting requests raise only mechanical questions that bear on the *burden* the request entails. Were we to adopt the Comptroller's position, we would, in effect, be holding that a request for something less than all of the information contained in a database requests a "new record," which would apply the "new record" exclusion more broadly to information stored in databases than to information stored on paper—an outcome inconsistent with the General Assembly's direction that we "[construe the Public Information Act] in favor of permitting inspection of a public record," SG § 10-612(b), and with the modern-day reality that agencies collect and maintain increasing amounts of information in electronic form.

C. **The Specific Information Requested By Mr. Immanuel Is Not Protected From Disclosure, But The Comptroller Need Not Sort That Information By Dollar Value Or Include Claims Valued At Less Than $100.**

Then, as a substantive matter, the Comptroller argues that the request seeks "information about the finances of an individual, including assets, income, liabilities, net

14

worth, bank balances, financial history or activities or creditworthiness" that is exempt from disclosure under the Public Information Act. SG § 10-617(f)(2). In a vacuum, we would agree that a list containing the names and addresses of people entitled to abandoned property in the Comptroller's possession reveals that the listed individuals own assets, whether or not listed in order of value. This would be true whether or not the list was limited to the top 5,000 claims, as Mr. Immanuel requested, and although the case gets closer if, as here, the request does not ask the Comptroller to reveal the value of each claim, the fact remains that anyone listed in the Comptroller's database has a potential claim to abandoned property, and a small or contingent asset is still an asset.

This particular request arises, however, in a unique context. The Abandoned Property Act *independently* requires the Comptroller to publish annually, in newspapers of broad circulation, the same core information Mr. Immanuel requests here—an alphabetical list of abandoned property owners with claims greater than $100—for the purpose of notifying the owners of abandoned property to claim it. *See* CL § 17-311(c). Mr. Eichler conceded, correctly, that Mr. Immanuel has not requested any information that would not be published in the annual disclosure. As such, the specific information at issue here is not, by law, protected from disclosure—to the contrary, the General Assembly has specifically directed the Comptroller to *disclose* this information for a public purpose (a purpose that, for what it's worth, is consistent with the purpose for which Mr. Immanuel wants the information). That affirmative and specific disclosure obligation trumps the application of the more general

15

disclosure exemption of individual financial information, *see Suter v. Stuckey*, 402 Md. 211, 231 (2007) ("In the case where two statutes apply to the same situation, we first attempt to reconcile them, and then, if the statutes remain contradictory, the more specific statute controls."), especially, again, in light of the Public Information Act's directive that we err on the side of disclosure, *see* SG § 10-612(b). The Comptroller erred, then, by denying the request, at least to the extent Mr. Immanuel seeks information the Comptroller is required by law to disclose.

That said, Mr. Immanuel's request overreaches in at least one way, and possibly two. *First*, a list of claims sorted in order of value *would* reveal a small margin of additional individual financial information, *i.e.*, the size of a person's claim relative to the claims above and below hers on the list. Neither Mr. Immanuel nor anyone else would be able to tell anything else from the mere order of the claims, but we are persuaded that the one thing the order does reveal—the claims' comparative value—discloses incremental financial information about the claim beyond the information the Abandoned Property Act requires the Comptroller to disclose. For that reason, Mr. Immanuel is not entitled to a list sorted by dollar value. *Second*, we cannot tell from the circuit court record whether the top 5,000 abandoned property claims all have a value of $100 or greater, and would thus be published by the Comptroller under CL § 17-311(c), or whether that list (or the Comptroller's proposed list of 10,000 claims) would reveal claims that the annual publication would not. If all 5,000 claims are worth $100 or more, the Comptroller should produce the data, subject to the

16

mechanical limitations and fees discussed above. If, however, a request for the top 5,000 claims includes claims valued below the annual publication threshold, it reaches beyond the boundaries the law permits and would need to be narrowed accordingly.

With these two caveats, we hold that Mr. Immanuel is entitled to the data that he seeks and that the Comptroller erred in denying his request. Our decisions overlap substantially with the circuit court's decision, but we cannot affirm its judgment. Instead, because the circuit court held that the Comptroller had not raised the "new record" argument and ordered the Comptroller to produce the data sorted by dollar value, we reverse the judgment below and remand for further proceedings for the limited purpose of allowing the circuit court to determine the precise boundaries of the production the Comptroller must make to Mr. Immanuel. In practical terms, Mr. Immanuel should emerge on remand with a list of claims that tracks the Comptroller's disclosure obligations under the Abandoned Property Act, but that is not sorted by dollar value.

> **JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**