*Andrew Glenn v. Maryland Department of Health and Mental Hygiene*, No. 48, September Term, 2015.  Opinion by Harrell, J.

**MARYLAND PUBLIC INFORMATION ACT – RECORDS – FREEDOM OF INFORMATION – TEMPORARY DENIAL**

The Maryland Public Information Act ("PIA") establishes a public policy favoring the disclosure of government documents. Although the PIA promotes disclosure, a public agency may refuse to disclose information that would "cause substantial injury to the public interest" pursuant to Maryland Code (2014), General Provisions Article, § 4-358, ("Gen. Prov.").  In the present case, denial by the State Department of Health and Mental Hygiene of a request for the names of owners, administrators, and medical directors on applications for approval of surgical abortion facilities was within the agency's authority and justified.

Circuit Court for Baltimore City
Case No. 24-C-13-004661

Argued: January 11, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 48

SEPTEMBER TERM, 2015

---

ANDREW GLENN

v.

MARYLAND DEPARTMENT OF HEALTH
AND MENTAL HYGIENE

---

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Harrell, Glenn T., Jr. (Retired, Specially
                        Assigned),
Wilner, Alan M. (Retired, Specially
                        Assigned),

JJ.

---

Opinion by Harrell, J.
McDonald, J., concurs.

---

Filed: February 22, 2016

To foster transparency in the operation of our State government, disclosure of documents and records relating to the operation of the government is a desirable priority generally. Public policy regarding such disclosure is made manifest by a strong presumption in favor of disclosure. *See Kirwan v. The Diamondback*, 352 Md. 74, 80, 721 A.2d 196, 199 (1998). Maryland's strong policy of disclosure is expressed in its Public Information Act ("PIA"). Swimming against that strong current, denial of information requested pursuant to the PIA is the subject of the current litigation.

## BACKGROUND

An impetus to regulate specifically surgical abortion facilities arose in Maryland following an investigation into the activities in Maryland of a doctor by the name of Steven Brigham, who operated abortion clinics in multiple states. *See* Erik Eckholm, *Maryland's Path to an Accord in Abortion Fight*, New York Times (July 10, 2013), http://www.nytimes.com/2013/07/11/us/marylands-path-to-an-accord-in-abortion-fight.html?_r=0 [https://perma.cc/BAQ2-57E6]. Dr. Brigham "was not licensed to practice in Maryland [and] had not even been required to notify the state health department when he set up [an] Elkton center to complete late-term abortions, after about the 14th week of pregnancy." *Id.*

This lack of specific governmental oversight led to dangerous conditions for women seeking abortions in Maryland and resulted, in 2012, in the Maryland Department of Health and Mental Hygiene ("DHMH") adopting new procedures regarding the application process for surgical abortion facilities. The regulations required that individuals and other entities must obtain a license from the Secretary of DHMH before

establishing or operating such a facility. *See* COMAR 10.12.01.02. Along with a $1500 application fee, any individual or entity who wishes to operate a facility must be compliant with relevant State and federal laws, file an application with DHMH, and "submit a written description of its quality assurance program" to DHMH. *See* COMAR 10.12.01.03.

On 12 March 2013, Petitioner Andrew Glenn, pursuant to the Public Information Act ("PIA"), Maryland Code (2014), General Provisions Article, § 4-101, *et seq.* ("Gen. Prov."),[1] requested the records of all such applications submitted for a license under these regulations. DHMH responded to Glenn's PIA request on 3 July 2013, providing copies of the applications, but with certain information redacted. DHMH redacted the names and email addresses (where the email address contained the individual's name) of individuals who were listed as owners, administrators, and medical directors for each facility, asserting that it "was in the public interest to deny access to those particular

---

[1] The Public Information Act ("PIA") provides that in general "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." Maryland Code (2014), General Provisions Article, § 4-103(a), ("Gen. Prov."). Under Gen. Prov. § 4-103(b), "unless an unwarranted invasion of the privacy of a person in interest would result, this title shall be construed in favor of allowing inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection."

pieces of information" pursuant to Gen. Prov. § 4-358(a).[2]  There was no redaction of corporate or other business names of applicants.

On 19 July 2013, DHMH filed a petition in the Circuit Court for Baltimore City, pursuant to Gen. Prov. § 4-358(b), seeking judicial confirmation for the continued denial of the names and email addresses of these individuals.[3]  The Circuit Court conducted a hearing on 18 April 2014 to hear argument.[4]  DHMH, arguing that disclosure of the redacted information was against the public interest, cited to instances where medical doctors and individual owners of this type of facility have been harassed, assaulted, or murdered around the United States over the last few decades.  Glenn relied essentially on the presumption in favor of disclosure under the PIA.  On 8 May 2014, the Circuit Court granted DHMH's petition, indicating that the agency's decision to redact was made on the basis of public safety concerns for those individuals who proposed to operate the facilities.

---

[2] This provision of the PIA allows an official custodian to deny temporarily inspection of a public record if "the official custodian believes that inspection would cause substantial injury to the public interest."  Gen. Prov. § 4-358(a).

[3] Under Gen. Prov. § 4-358(b), "[w]ithin 10 working days after the denial, the official custodian shall petition a court to order authorization for the continued denial of inspection."  Continued denial will be allowed if "after the hearing, the court finds that inspection of the public record would cause substantial injury to the public interest, the court may issue an appropriate order authorizing the continued denial of inspection."  Gen. Prov. § 4-358(d).

[4] There was no testimony.  Such "evidence" as was before the Circuit Court was found in paper submissions, some of which we will discuss later in this opinion.

Glenn appealed timely to the Court of Special Appeals, which affirmed the Circuit Court's judgment on 21 April 2015 in an unreported opinion. The intermediate appellate court gave deference to "the agency's interpretation of statutes that it administers" and found cases decided under the federal Freedom of Information Act ("FOIA") to be persuasive. The Court of Special Appeals concluded "that DHMH provided a reasonable and sufficiently supported explanation" for redaction due to the national historical record of violence and harassment towards abortion providers and the potential chilling effect it would have on providers if redaction did not occur.

We granted Glenn's Petition for a Writ of Certiorari, *Andrew Glenn v. Maryland Department of Health and Mental Hygiene*, 444 Md. 638, 120 A.3d 766 (2015), to consider the following questions:

> 1. Did the Court of Special Appeals err in granting deference to DHMH's legal conclusion that it was authorized, under Gen. Prov. § 4-358 of the Maryland PIA, to redact the records in question?
>
> 2. Did the Court of Special Appeals err in substituting for the PIA's requirement of proof of "substantial injury to the public interest" the far less demanding standard of mere "greater risk" that disclosure of public information might have a "chilling effect" on owners of regulated businesses?

Although we do not agree completely with some of the reasoning of our intermediate appellate court brethren, we affirm the judgment that redaction and denial of the relevant information in this case was appropriate.

**STANDARD OF REVIEW**

We review for clear error the decision by an agency to deny disclosure to an individual requesting information under the PIA. We determine whether the "court had

4

an adequate factual basis for the decision it rendered and whether the decision the court reached was clearly erroneous." *Comptroller of Treasury v. Immanuel*, 216 Md. App. 259, 266, 85 A.3d 878, 883 (2014) (citing *Haigley v. Dep't of Health & Mental Hygiene,* 128 Md. App. 194, 210, 736 A.2d 1185, 1193 (1999)). Under this standard, "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence [and] will not set aside the judgment of the trial court on the evidence unless clearly erroneous." Maryland Rule 8-131(c).

## DISCUSSION

### I. Contentions

Glenn contends that the Court of Special Appeals's decision undermines the Public Information Act and grants "unbridled discretion to government agencies to keep information hidden from the public scrutiny." He argues further that the intermediate appellate court misinterpreted the standard set forth in Gen. Prov. § 4-358 and created "precedent" that applies a less stringent standard than required in PIA cases where non-disclosure is invoked. DHMH responds that the Court of Special Appeals concluded correctly that, based on public safety, public health, and health access harms related to harassment of abortion providers, it was within the authority of DHMH to redact the names of the designated categories of individuals involved with the applications for the proposed surgical facilities and that such redaction should be continued.

### II. The Maryland Public Information Act

Enacted in 1970, the PIA was created to "provide the public the right to inspect the records of the State government or of a political subdivision within the State." *Haigley*,

5

128 Md. App. at 207, 736 A.2d at 1191 (quoting *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506, 474 A.2d 880, 887 (1984)). The PIA provides a general right to information – "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." Gen. Prov. § 4-103(a). Accordingly, "[t]o carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest would result, this title shall be construed in favor of allowing inspection of a public record." Gen. Prov. § 4-103(b). Unsurprisingly, the provisions of the statute are to be "liberally construed. . . in order to effectuate the Public Information Act's broad remedial purpose." *Haigley*, 128 Md. App. at 208, 736 A.2d at 1192 (internal quotation marks omitted).

There are "well-established general principles governing the interpretation and application of the [PIA which] create a public policy and a general presumption in favor of disclosure of government or public documents." *Maryland Dep't of State Police v. Maryland State Conference of NAACP Branches*, 430 Md. 179, 190, 59 A.3d 1037, 1043 (2013) (citation and internal quotation marks omitted). Although, the presumption skews heavily the calculus toward disclosure,[5] it may be rebutted. The ability to rebut the

---

[5] It has been stated by the Court of Special Appeals that "the purpose of the PIA is 'virtually identical' to that of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 and that interpretations of the federal statute are ordinarily persuasive." *See Haigley v. Dep't of Health & Mental Hygiene*, 128 Md. App. 194, 210, 736 A.2d 1185, 1193 (1999) (citation and quotation marks omitted).

Nonetheless, the federal FOIA and its protections (particularly its express exemptions) differ from the exceptions in Maryland's PIA. *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141 (D.C. Cir. 2006) illustrates a distinction relevant to the

(Continued…)

presumption is not to be construed liberally, however, because the PIA was established with the over-arching purpose of allowing oversight of the government, resulting in a strong practice of disclosure.

The ability to rebut the presumption in favor of disclosure is found in the "exceptions to the general rule favoring disclosure," which are provided in an enumerated list of the records and type of information that is (or may be) excluded from public disclosure. *Bowen v. Davison*, 135 Md. App. 152, 158, 761 A.2d 1013, 1016 (2000).[6] The custodian of a record requested under the PIA "*shall* deny inspection of a public record" if it is privileged, confidential, or the inspection would be contrary to restrictions in other statutes. *See* Gen. Prov. § 4-301(a) (emphasis added). Under Gen. Prov. § 4-343, "if a

---

(…continued)
present case. The federal FOIA exemption in question in *Judicial Watch* allows an agency to "withhold personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Judicial Watch, Inc.*, 449 F.3d at 152 (quoting 5 U.S.C. § 552(b)(6)). This exemption has been read broadly, with the U.S. Supreme Court "concluding the propriety of an agency's decision to withhold information does not 'turn upon the label of the file which contains the damaging information.'" *Judicial Watch, Inc.*, 449 F.3d at 152 (quoting *U.S. Dep't of State v. Washington Post Co.,* 456 U.S. 595, 601 (1982)).

The federal court in *Judicial Watch* concluded further that the statute exempted "not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[ ] a palpable threat to privacy.'" *Judicial Watch, Inc.*, 449 F.3d at 152 (citation omitted). It is apparent that the federal FOIA exemption at the core of *Judicial Watch* is not a catch-all exemption unlike the PIA exception in play in the present case. Because the two exemption schemes are distinguishable, we choose not to rely directly on the holdings in cases interpreting FOIA exemptions in aid of our analysis of the relevant PIA exception here. This is not to be understood as meaning that we shall avoid referring to FOIA cases for other purposes.

[6] *See* Gen. Prov. §§ 4-301 to 4-355.

7

custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian *may* deny inspection by the applicant of that part of the record." (emphasis added).[7]  More relevant to this case, unlike the sections which "list specific records that may be withheld from disclosure, [Gen. Prov. § 4-358] is a 'catch-all' provision that allows the custodian to exempt temporarily records in the 'public interest.'" *Bowen*, 135 Md. App. at 165, 761 A.2d at 1020.

Under Gen. Prov. § 4-358(a), "[w]henever this title authorizes inspection of a public record but the official custodian believes that inspection would cause substantial injury to the public interest, the official custodian *may* deny inspection temporarily." (emphasis added).  If "after [a] hearing, [a] court finds that inspection of the public record would cause substantial injury to the public interest, the court may issue an appropriate order authorizing the continued denial of inspection."  Gen. Prov. § 4-358(d).  It is clear that "[t]he General Assembly did not intend for custodians broadly to claim exemptions." *Cranford v. Montgomery Cnty.*, 300 Md. 759, 777, 481 A.2d 221, 230 (1984).  The PIA's inclination towards disclosure is not to be overcome lightly; however, we decide in this case that DHMH presented sufficient evidence to warrant the continued denial of the sought-after information.

### III. The Factual Record Presented in Support of Redaction, Including Appropriate Judicial Notice of Certain Facts

---

[7] Under Gen. Prov. § 4-301(b)(2), if the individual requesting production of the records files a complaint regarding the denial, the "custodian shall demonstrate that: . . . the harm from disclosure of the public record is greater than the public interest in access to the information in the public record."

8

It is apparent from the numerous exemptions listed in Maryland's PIA that there are situations where the Legislature contemplated specific information could be excluded from the public reach. Because there is no specific exception numbered among them that applies directly to the licensing procedures of surgical abortion facilities, the basis of any agency denial would have to fall under Gen. Prov. § 4-358. DHMH, as the public agency administering the relevant regulatory scheme for such facilities, "bears the burden in sustaining its denial of the inspection of public records." *Office of Governor v. Washington Post Co.*, 360 Md. 520, 545, 759 A.2d 249, 263 (2000).

Gen. Prov. § 4-358(a) does not demand absolute certainty that the public interest would be harmed by disclosure, only that the disclosure of the information "would cause substantial injury to the public interest." Here, the threat does not create merely a greater risk because the threat to the public interest is more than speculative. It is well-known that there is "widespread hostility" in certain quarters towards abortion and abortion providers, as summarized by a federal court in Alabama:

> Against the backdrop of this history of violence, abortion providers and women seeking abortions. . . live and work in a climate of extreme hostility to the practice of abortion. On a day-to-day basis, a provider or a patient sees this hostility when she opens the newspaper, drives by a group of protesters at a clinic, or learns that another piece of legislation concerning abortion has been enacted. Of course, the court does not imply that such activities are illegal, improper, or morally wrong; indeed, the right to express deeply held beliefs is of the utmost importance. But it is nonetheless necessary to recognize that such actions contribute to the climate surrounding the disputes in this case.

*Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1334 (M.D. Ala. 2014) (applying Alabama law). There are numerous out-of-state cases cataloging an

9

unfortunate and lamentable record of violence towards abortion providers, including

murders, harassment, and general violence.[8]  In *Judicial Watch, Inc. v. Food & Drug

Admin.*, 449 F.3d 141, 153 (D.C. Cir. 2006)[9], the evidence included:

> As its privacy interest, the FDA cited the danger of abortion-related
> violence to those who developed mifepristone, worked on its FDA
> approval, and continue to manufacture the drug.  The supporting affidavits
> detail evidence of abortion clinic bombings.  They also describe websites
> that encourage readers to look for mifepristone's manufacturing locations
> and then kill or kidnap employees once found.

This history of violence associated with the provision of abortion services is undeniable.

Much like the Circuit Court and the Court of Special Appeals, we cannot disagree

with DHMH's conservative approach to disclosure of information about the providers,

administrators, and facility managers.[10]  We conclude that DHMH presented sufficient

facts to the Circuit Court to show that public safety and public health would be affected

substantially if the requested information was disclosed.  These facts were presented in

---

[8] Thankfully, there is nothing in this record of this sort of extreme conduct in Maryland.  That does not mean that DHMH is bound to be the proverbial ostrich with its head in the sand as to what has occurred elsewhere.

[9] Consistent with our representation at the end of n.5 *supra*, we include discussion here of *Judicial Watch* for a purpose other than to refer to its reasoning regarding a FOIA exemption.

[10] We afford to DHMH deference only as to its interpretation and administration of the agency's regulations, not its application of the provisions of the PIA.  The appropriate "deference is premised on the notion that the agency has particular expertise in the area governed by the statute.  In this case, however, it is salient that the Department does not necessarily have any expertise with respect to the PIA." *Haigley*, 128 Md. App. at 216, 736 A.2d at 1196 (internal citation omitted).

the form primarily of a 19 July 2013 affidavit from Patrick Dooley, then Chief of Staff for DHMH. Dooley's affidavit presented facts regarding the history of violence that is associated too frequently with a career in providing surgical abortion services. The affidavit spoke to DHMH's acknowledgment of the public's interest in the licensing process for surgical abortion facilities, as well as the enforcement of the associated regulations. To this end, DHMH maintains a website, which contains public information about licensed facilities and any complaints or reports filed against them.[11] Dooley's affidavit further explained the Department's reasoning for redacting the information:

> From my work in the public health field, I am generally aware that persons affiliated with surgical abortion facilities have been targets of threatened and actual violence, including fatal shootings. The National Abortion Federation, a professional association of abortion providers, compiles statistics on violent incidents targeting abortion providers and their facilities. . . . At least one website, in listing the names and contact information of physicians who perform abortion procedures, uses strikethrough font to denote those who have been killed in incidents of violence.

The evidence of these threats and actual incidences of violence related to out-of-state occurrences, but Dooley referred also to a few associated events reported in Maryland, for example:

---

[11] Maryland Dep't of Health & Mental Hygiene, *Ambulatory Care: Surgical Abortion Facilities*, http://dhmh.maryland.gov/ohcq/ac/Pages/Surgical-Abortion-Facilities.aspx [https://perma.cc/N284-WKFJ]. DHMH posts alerts about any suspensions or disciplinary actions taken against the surgical abortion facilities registered in Maryland. By making this information available, the general public is privy to any qualitative issues that are reported to and investigated by DHMH relative to any of these facilities. Thus, an argument that a woman seeking an abortion would be deprived of the ability to investigate a facility for disciplinary action, unless the type of information sought by Glenn were made public, is unfounded.

11

> In addition to threats of violence and actual violence, persons who are connected with surgical abortion facilities have experienced unwarranted invasion of personal privacy, such as identification and targeting of spouses and children for protest actions. One recent incident in Maryland involved anti-abortion protestors appearing at the middle school of the child of the landlord of a surgical abortion facility.

Although the protestors in the school demonstration were not apparently in violation of any law, Dooley noted that "[o]ne concern expressed by some stakeholders in the adoption of the regulations governing surgical abortion facilities was that, if compliance with the regulations were burdensome, the enforcement of the regulations could have the practical effect of restricting women's access to abortion services."

Additionally, Dooley pointed out that if revealing this information subjected staff members to harassment, "an unintended effect of the regulations could be to discourage providers from seeking licensure or from offering the service at all. Not only could this restrict access to health care services, it could also lead to facilities or providers attempting to evade the Department's licensure requirements, increasing the risk to the public health."

Dooley concluded ultimately:

> In reviewing this request, I therefore concluded that despite the public's important interest in the Department's licensing procedures for surgical abortion facilities, there would be substantial injury to the public interest if the identities of medical directors, administrators, and owners of surgical abortion facilities were disclosed as part of the response to a request for public inspection of the Department's licensure records. First, disclosing these names could result in harassment, threats or actual violent harm to these individuals, as well as unwarranted invasion of their personal privacy and that of their family members. Second, the Department's action in releasing these names could deter others from operating surgical abortion facilities or from applying for licensure, restricting access to legal health services and risking injury to public health.

Glenn argues that these statements from Dooley and DHMH are not sufficient to fulfill the rigorous PIA "catch-all" exception standard. He argued before the Circuit Court that "the whole point of a Public Information Act is that the public doesn't have to take the government's word for it. That the government is able or willing to do an adequate job."

What appears lost on Glenn is that DHMH did provide him with all of the basic information about the facilities and business entities, if any, in the applications, as well as any accreditation under which the facility would operate. This information, even with the redaction of the medical director's or administrator's names, is helpful in "public policing" of the Department's action on the applications for the surgical abortion facilities. Furthermore, a woman contemplating a procedure at one of the facilities would be able to review the same information and conduct research on the business entities proposing to operate the facilities. *See supra* fn. 11. Because of the history nationally of harassment and violence associated with the provision of abortion services, there is a palpable basis for concern that releasing the redacted information would jeopardize medical professionals from practicing within this particular field, which would deter ultimately access to women who seek an abortion in Maryland. The risk of violence is not speculative and is based on the ample evidence presented. The threshold for a denial under Gen. Prov. § 4-358 was crossed.

In an attempt to persuade this Court otherwise, Glenn directs us to the public information statutes of other states, including Illinois, Minnesota, and Kansas, and cases

decided under them. In Illinois, the public information act "shall be construed to require disclosure of requested information as expediently and efficiently as possible." 5 Ill. Comp. Stat. Ann. 140/1. The Illinois statute provides a long list of exemptions, but, unlike the Maryland PIA, does not provide a "catch-all" provision. The only comparable "general" exemption in Illinois focuses solely on the privacy of the individual: "Nothing in this section shall require the State to invade or assist in the invasion of any person's right to privacy." *Family Life League v. Dep't of Pub. Aid*, 493 N.E.2d 1054, 1056-57 (Ill. 1986) (citing Ill.Rev.Stat.1979, ch. 116, par. 43.6).

The courts in Kansas and Minnesota allow, under open record acts, the disclosure of somewhat similar information to that sought by Glenn here. The cases cited involve requests for disclosure of the names of physicians who received public funds (such as state Medicaid plans) to perform abortion services for low-income women.[12] Those courts did not find that disclosure would chill, impede, or burden a women's right to access these services.

The courts in the three states (Illinois, Kansas, and Minnesota) concluded also that any evidence of harassment or harm that would be directed at the doctors whose information was disclosed was "highly speculative." The Minnesota statute provides that all archived records "shall be accessible to the public," unless it is determined by the

---

[12] *See Minnesota Med. Ass'n v. State*, 274 N.W.2d 84 (Minn. 1978); *State ex rel. Stephan v. Harder*, 641 P.2d 366 (Kan. 1982). The Kansas case Glenn points to, *State ex rel. Stephan v. Harder*, 641 P.2d 366 (Kan. 1982), relies on portions of the Kansas Open Records Act, which since has been repealed.

agency that the information contained in the record "if disclosed, would constitute a clearly unwarranted invasion of personal privacy. Disclosure of an individually identifiable record does not constitute a clearly unwarranted invasion of personal privacy if the public interest in disclosure outweighs the privacy interest of the individual." Minn. Stat. Ann. § 138.17, subd. 1c(a)(6) (2007). The Minnesota court did not find that disclosure of the information would place a "burden on the doctor [or] destroy the confidentiality of his relationship with patients." *Minnesota Med. Ass'n v. State*, 274 N.W.2d 84, 92 (Minn. 1978).

The Illinois court explained that:

> [T]he feared harassment is highly improbable. In Illinois, the *only* type of abortions performed under the Medicaid abortion program are restricted to those instances where, "in the opinion of the physician, such procedures are necessary for the preservation of the life of the woman seeking such treatment.". . . Abortions performed under such circumstances are the least likely to provoke public controversy, and therefore physicians who perform such abortions would be the least likely to be harassed.

*Family Life League*, 493 N.E.2d at 1058.[13] The Kansas court concluded that it could not determine "on the basis of this record, that disclosure would have a 'legally significant impact' on the abortion decision or on the physician-patient relationship." *State ex rel. Stephan v. Harder*, 641 P.2d 366, 376 (Kan. 1982). The court determined further that the

---

[13] This case and the other two were decided prior to modern abortion facility licensure laws, which have expanded greatly since the 1970s and 1980s. Similarly, the hostile events aimed as abortion providers intensified since these cases were decided. Respectfully, we (and DHMH, the Circuit Court, and the Court of Special Appeals) see the likelihood of violence, in view of facts in this record, to be not as speculative as these courts in the out-of-state cases cited by Glenn.

state statute gave the custodian of the record "no discretion and no choice; it imposes a duty upon the custodian, and subjects him or her to stringent penalties for noncompliance." *Harder*, 641 P.2d at 375.

The major distinctions we perceive between these older cases and the factual predicate of the agency denial decision before us are the differing language of the statutes and the individuals about whom the information was sought.[14] As noted by the Kansas court, "it is likely that the nature of the doctor's practice would be known even without

[14] At oral argument, Glenn's counsel mentioned also Indiana and Florida as additional states that allow the disclosure of comparable information. We do not find, however, the statutes of either state to be comparable to Maryland's PIA and thus cases from those states are not persuasive to us. In Indiana, the state code provides that:

> it is the public policy of the state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. Providing persons with the information is an essential function of a representative government and an integral part of the routine duties of public officials and employees, whose duty it is to provide the information. This chapter shall be liberally construed to implement this policy and place the burden of proof for the nondisclosure of a public record on the public agency that would deny access to the record and not on the person seeking to inspect and copy the record.

Ind. Code Ann. § 5-14-3-1 (1995). The Indiana statute allows a public agency to withhold disclosure if that information would have "a reasonable likelihood of threatening public safety," but only applies to information sought from law enforcement agencies. *See* Ind. Code Ann. § 5-14-3-4.4(a)(2)(B) (2013).

Florida requires "that all state, county, and municipal records are open for personal inspection and copying by any person." Fla. Stat. Ann. § 119.01 (2005). A court may decide that there "is a substantial probability that opening the records for inspection will result in significant damage" and issue a stay order to deny disclosure. Fla. Stat. Ann. § 119.11. Unlike Maryland, however, Florida's statutory scheme provides no "catch-all" exception that balances the public interest against an obligation or presumption in favor of disclosure.

disclosure of the department's information." *Harder*, 641 P.2d at 377. Because this information would be available already, "it is improbable that disclosure will have any significant effect on the inferences that can be drawn from the fact that a woman visits a particular physician." *Id.* Because this information was likely available already, any additional disclosure allowed would not pose any additional threat to the providers. This is a completely different factual situation than the one before us.

Here, it was made clear by our questioning at oral argument (and responses) that a woman in Maryland seeking an abortion would be able to research the surgical facilities licensed by DHMH and learn of any deficiency reports, plans of correction, or disciplinary records that have been filed. Any woman seeking treatment would be allowed access to a list of doctors who were licensed in Maryland to provide these services and would be able to check the doctor's accreditations, records, and any disciplinary action taken against him or her,[15] irrespective of whether the application information at issue in the present case was redacted. We are convinced that the redaction in the present case was necessary to avoid a substantial injury to the public

---

[15] Doctors in Maryland are licensed by the Maryland Board of Physicians. The Board provides information publicly about disciplinary actions against doctors and lists those physicians who have had their licenses revoked. *See* DHMH: Maryland Board of Physicians, *Disciplinary Alerts*, http://www.mbp.state.md.us/pages/disciplinary.html [https://perma.cc/V5AN-BBHY]. Thus, any argument that disclosure of the names of administrators who applied for licensure of a surgical abortion facility would protect women from another "Dr. Brigham" is unwarranted. Any woman who sought information about a particular doctor and his or her disciplinary past would be able to review that information, without impediment because of the non-disclosure of the names of the persons in the licensure applications that Glenn seeks.

interest.    Therefore, we conclude that the requested information was redacted properly

under Gen. Prov. § 4-358 in order to protect the public interest from a substantial injury.

We affirm the judgment of the Court of Special Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 48

SEPTEMBER TERM, 2015

ANDREW GLENN

v.

MARYLAND DEPARTMENT OF HEALTH
AND MENTAL HYGIENE

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Harrell, Glenn T., Jr.
   (Retired, Specially Assigned)
Wilner, Alan M.
   (Retired, Specially Assigned),

JJ.

Concurring Opinion by McDonald, J.

Filed: February 22, 2016

The Public Information Act ("PIA") reflects a public policy that the operation of government should be open to public scrutiny. Maryland Code, General Provisions Article ("GP"), §4-103(a) ("All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees."). Accordingly, the statute is to be construed in favor of disclosure of public records and information. GP §4-103(b).

As the Majority opinion explains, the public records at issue in this case are part of a licensing scheme that was created in response to documented malpractice in Maryland facilities operated by Dr. Steven C. Brigham, a physician who had been disciplined in other states and whose activities exposed a gap in State oversight. Majority slip op. at 1-2. The PIA normally would require records relating to such licensing to be open to public inspection. This reflects the general policy that the identities and qualifications of those authorized by the State to provide services to the public in some way should not be secret.[1] In particular, the Legislature presumably did not intend for the next Dr. Brigham – or Dr.

---

[1] The PIA contains an exception from disclosure for certain parts of licensing records. *See* GP §4-333. That exception applies only to records relating to the licensing of individuals and not to the licensing of business entities or medical facilities. *See* 71 *Opinions of the Attorney General* 305, 311 (1986) (noting a "deliberate legislative determination" that the exception pertains to licensing of individuals and not of business entities). But even the exception related to licensing records of individuals explicitly requires disclosure of the name of the individual, his or her business address, professional qualifications, and disciplinary record, among other things. GP §4-333(b). The decision to make such information publicly available was the result of "a careful balancing of the access rights of the public and the privacy rights of licensees." *See* Governor's Information Practices Commission, Final Report 535-38 (1982).

Brigham himself[2] – to escape public detection simply through the expedient of setting up an LLC or a corporation.

All of this is not to denigrate the competence or good faith of the State officials who oversee this licensing regime. Public oversight of the regulators' actions in carrying out that scheme is a healthy thing. It is not uncommon that something slips by an overworked regulator and is only brought to light by the press or a citizen with access to public records. As Justice Brandeis famously said: "Sunlight is said to be the best of disinfectants."

It is thus an extraordinary thing for a State agency to withhold information relating to the licensing of a business entity – in particular, the identities of those who operate it – in response to a PIA request. In proceeding under the temporary denial provision of GP §4-358, the Department of Health and Mental Hygiene ("DHMH") has correctly acknowledged that neither the PIA nor any other statute shields this specific information from public disclosure. *See Cranford v. Montgomery County*, 300 Md. 759, 776, 481 A.2d 221 (1984); *Mayor and City Council of Baltimore v. Burke*, 67 Md. App. 147, 151-52, 506 A.2d 683 (1986).

The Court's decision to uphold this deviation from the usual principle of public access can be justified by the peculiar circumstances of this case. In particular, at the hearing in the Circuit Court in which DHMH had the burden of justifying an extension of the temporary denial of access, the requester did not contest DHMH's petition by cross-

---

[2] The newspaper article cited in the Majority opinion suggests that Dr. Brigham was still involved in the operation of clinics in Maryland after the licensing regime was put in place.

2

examining DHMH's affiant concerning the conclusions he had reached or by offering its own evidence.

Moreover, the denial of access is very limited in content and time. Only one or two names and email addresses – and only to the extent that an email address discloses those names – have been redacted from the records. While the court order that allows DHMH to continue to withhold the information from this requester does not have an end date, it is by its nature peculiar to this time and circumstance. The justification may dissipate with time and with new facts. It is not a precedent that necessarily forecloses forever the disclosure of such information. *Cf. Cranford*, 300 Md. at 789.

Finally, the Court's opinion is premised on the understanding – consistent with the law relating to occupational licenses noted above – that the accreditation and disciplinary records of the doctors who work in these facilities is available under the PIA. Majority slip op. at 17.